## Olga Monge v. Beebe Rubber Company

February 28, 1974

*Leonard & Harkaway* and *Jeffrey H. Mazerolle* (*Mr. Mazerolle* orally) for the plaintiff.

*Hamblett, Kerrigan, LaTourette & Lopez* (*Mr. Joseph M. Kerrigan* orally) for the defendant.

Lampron, J.  Action of assumpsit to recover damages for an alleged breach of an oral contract of employment. Plaintiff was hired in September 1968 at wages of $1.84 per hour to work on a conversion machine in defendant's factory and was allegedly told that if she worked well she would get better jobs with better pay. Plaintiff claims that she was harassed by her foreman because she refused to go out with him and that his hostility, condoned if not shared by defendant's personnel manager, ultimately resulted in her being fired. Trial by jury resulted in a verdict for the plaintiff in the amount of $2,500. Defendant's objections to denial of its motion to set aside the verdict, for judgment n.o.v. and to various evidentiary and substantive rulings were reserved and transferred by *Loughlin*, J.

Plaintiff, before coming to this country in 1964, was a school teacher in Costa Rica. She came to New Hampshire in 1965, and was attending college from 7 to 10 o'clock five nights a week to qualify to teach here. She used the money she

earned from her employment with the defendant on the night shift beginning at 11 o'clock for her college expenses. She was employed by the defendant in a union shop and joined the union as required after her employment, thereby becoming subject to the seniority and other rules of the union contract. After working without incident on the conversion machine for about three months, she applied to fill an opening on a press machine at higher wages. She testified that her foreman told her that if she wanted the job she would have to be "nice". She got the job at $2.79 per hour and claims that her foreman then asked her to go out with him, which she refused to do because she was married and had three children. After working on the press machine for about three weeks, the machine was shut down and she was put on a degreaser machine at $1.99 per hour. Her overtime was taken away, although no else's was. She testified that when she told her foreman she needed overtime money he told her she could sweep floors. She agreed to do this and claims the foreman also made her clean the washrooms and ridiculed her.

On July 23, 1969, she ran out of boxes for her machine. When she reported this to the foreman, he told her to make her own, which she claims she could not do while keeping up her production. When she spoke to the union steward about it, the foreman ordered her back to her machine and fired her at 2 o'clock in the morning when she refused to comply with his order. After complaining to the union, she was reinstated with a warning.

On Saturday, July 26, she called the personnel manager at his home to tell him that on advice of her lawyer she was calling to say she would not be in on Sunday because of illness. She also called in on Sunday, July 27, to say she would not be able to work because of illness and would enter the hospital the next day. The company's records show her absent with excuse on July 28 through 31.

She testified that when she reported for work at 11 p.m. on the night of August 4, the personnel manager was there, although she had never seen him at the plant before at that time of day, and that he asked her "What kind of face I got to come back?" After being at work for two and

one-half hours that same night, she was found unconscious in the ladies' room and was taken to the hospital. The company records show her hospitalized for the next four days including August 8. Nothing is shown in these records regarding the next two days but they show her absent on August 11, 12 and 13 without having called in . On August 13, 1969, the personnel manager sent her a letter stating that since she failed to report for work for three consecutive days without notification to the company, she was "deemed a voluntary quit."

There was evidence both from the plaintiff and the foreman that she did in fact call in on Sunday, August 10, to report that she was still sick. There was also evidence that some time after defendant had refused her foreman's advances, the personnel manager had visited her at home about some annoying telephone calls she was receiving. In the course of their conversation, he told her he knew her foreman used his position to force his attentions on the female employees under his authority and he asked her "not to make trouble".

Plaintiff sued for breach of an employment contract for an indefinite period of time. The employer has long ruled the workplace with an iron hand by reason of the prevailing common-law rule that such a hiring is presumed to be at will and terminable at any time by either party. 53 Am. Jur. 2d *Master and Servant* § 43 (1970); 9 S. Williston, Contracts § 1017 (W. Jaeger ed. 1967); Restatement (Second) Agency § 442 (1958); *see* Blumrosen, *Seniority and Equal Employment*, 23 Rutgers L. Rev. 270 (1969). When asked to reexamine the long-standing common-law rule of property based on an ancient feudal system which fostered in a tenancy at will a relationship heavily weighted in favor of the landlord, this court did not hestitate to modify that rule to conform to modern circumstances. *Kline v. Burns,* 111 N.H. 87, 90, 276 A.2d 248, 250 (1971); *Sargent v. Ross,* 113 N.H. 388, 308 A.2d 528 (1973).

The law governing the relations between employer and employee has similarly evolved over the years to reflect changing legal, social and economic conditions. 3A A. Corbin, Contracts § 674, at 205, 206 (1960). In this area "[w]e are in the midst of a period in which the pot boils the hardest

and the process of change the fastest." *Id.* Although many of these changes have resulted from the activity and influence of labor unions, the courts cannot ignore the new climate prevailing generally in the relationship of employer and employee. *See* Comment, *Contracts – Termination of Employment At Will – Public Policy May Modify Employer's Right to Discharge,* 14 Rutgers L. Rev. 624 (1960); Blumrosen, *Employee Discipline,* 18 Rutgers L. Rev. 428, 431-33 (1964).

In all employment contracts, whether at will or for a definite term, the employer's interest in running his business as he sees fit must be balanced against the interest of the employee in maintaining his employment, and the public's interest in maintaining a proper balance between the two. *See* Note, *California's Controls On Employer Abuse of Employee Rights,* 22 Stanford L. Rev. 1015 (1970). We hold that a termination by the employer of a contract of employment at will which is motivated by bad faith or malice or based on retaliation is not in the best interest of the economic system or the public good and constitutes a breach of the employment contract. *Frampton v. Central Indiana Gas Co.,* 297 N.E.2d 425 (Ind. 1973); *see Petermann v. Teamsters Local 396,* 174 Cal. App. 2d 184, 189, 344 P.2d 25, 27 (1959); Blades, *Employment At Will v. Individual Freedom: On Limiting the Abusive Exercise of Employer Power,* 67 Colum. L. Rev. 1404, 1418 (1967). Such a rule affords the employee a certain stability of employment and does not interfere with the employer's normal exercise of his right to discharge, which is necessary to permit him to operate his business efficiently and profitably.

The sole question on appeal is whether there was sufficient evidence to support the jury's finding that defendant, through its agents, acted maliciously in terminating plaintiff's employment. It is the function of the jury to resolve conflicts in the testimony, *Kilfoyle v. Malatesta,* 101 N.H. 473, 475, 147 A.2d 111, 113 (1958); and the law is settled that a jury verdict will not be disturbed on appeal if there is evidence to support it. *See O'Brien v. Public Service Co.,* 95 N.H. 79, 58 A.2d 507 (1948); *Benoit v. Perkins,* 79 N.H. 11, 104 A. 254 (1918).

The jury could draw the not-so-subtle inference from the evidence before it that the hostility of defendant's foreman

and connivance of the personnel manager resulted in the letter of August 13, 1969, and that that letter was in effect a discharge. *See Colorado Civil Rights Comm'n v. State School Dist. No. 1,* 488 P.2d 83, 86 (Colo. App. 1971). The foreman's overtures and the capricious firing at 2 a.m., the seeming manipulation of job assignments, and the apparent connivance of the personnel manager in this course of events all support the jury's conclusion that the dismissal was maliciously motivated.

In our opinion, however, the verdict includes elements of damage not properly recoverable. The plaintiff lost 20 weeks employment at an average pay of $70.81 per week. This would account for $1,416.20 of the verdict, leaving $1,083.80 attributable to mental suffering. Such damages are not generally recoverable in a contract action. *Dunn & Sons, Inc. v. Paragon Homes of New Eng., Inc.,* 110 N.H. 215, 218, 265 A.2d 5 (1970); *Francoeur v. Stephen,* 97 N.H. 80, 81 A.2d 308 (1951); *Johnson v. Waisman Bros.,* 93 N.H. 133, 36 A.2d 634 (1944). They could not be found in this case to have resulted from the discharge. Defendant had been having difficulty with her husband and had been receiving annoying telephone calls which upset her. She presented no medical testimony. Although she alleged that her discharge caused her mental suffering, her difficulties all preceded the discharge. We therefore remand the case for a new trial unless the plaintiff consents to a reduction of the verdict by the amount of $1,083.80.

*Remanded.*

GRIFFITH, J., did not sit; GRIMES, J., dissented; the others concurred.

GRIMES, J., dissenting:
In my view, reasonable men could not find for the plaintiff on the evidence in this case even under the new rule of law which the court has fashioned today. The substance of the plaintiff's claim is that she was discharged because she did not accept an invitation of her foreman to go out with him. Although it was denied by the foreman, the jury could

find on plaintiff's testimony alone that the invitation was extended. It was a single instance, however, and there is no claim that it was repeated or further pursued. It is not findable that this single refusal was the reason for the termination of plaintiff's employment. There was evidence, and none to the contrary, that it was a shortage of work and her lowest seniority that caused her press machine to be shut down and her loss of overtime. When her machine was shut down, she was given work on a degreasing machine at a higher rate of pay than when she started. When she told the foreman she "needed the money" from the overtime, he offered what from the uncontradicted evidence was the only work available to help her out until her overtime was restored. The only so-called harassment and ridicule claimed amounts to no more than once saying "How do you like my floor boy?" and "My wife wouldn't do that." It is uncontradicted that when she was having trouble with annoying phone calls and needed help, the personnel manager personally went to the police and then to her home to talk with her and her husband; that when she could not pick up her Christmas turkey, the foreman personally delivered two instead of one to her home; and that he also at her request gave her husband, a mechanic, work on his automobile.

Her final termination was in accordance with established company rules and she neither contested the termination nor pursued the grievance procedures under the union contract. She was denied unemployment compensation on the ground that she was a "voluntary quit" and did not appeal that finding.

A finding that this company discharged the plaintiff because she refused her foreman a date eight months before could not reasonably be made and should not be permitted to stand.

Apart from the facts, I cannot subscribe to the broad new unprecedented law laid down in this case. *Frampton v. Central Indiana Gas Co.*, 297 N.E.2d 425 (Ind. 1973), cited for its support was a tort action to recover actual and punitive or exemplary damages for a discharge in retaliation for filing a workmen's compensation claim. The court treated the threat of discharge as a "device" prohibited by the Workmen's

Compensation Act to avoid the employer's statutory obliga-
tions. The Indiana court stated that it could find no case
anywhere to support such an action but held the discharge
to be an intentional wrong prohibited by statute and in clear
contravention of the public policy. That case, however, is
not authority for the court's new contract law. *Petermann v.
Teamsters Local 396,* 174 Cal. App. 2d 184, 344 P.2d 25 (1959)
is also inapposite. There, the court allowed recovery only
in order to uphold a public policy against perjury. The
protection given by the union contract governing the right
to discharge and the grievance procedures therein established
remove this plaintiff from that class of employee for which
concern is expressed in the law review articles cited by the
court. Not a single case has been found which supports the
broad rule laid down by the court to support an action for
breach of contract in this case. In fact, the law everywhere,
uniformly supported by scores of cases is that an employment
contract for an indefinite period is one "at will and is termin-
able at any time by either party" regardless of motive for
"good cause, bad cause or no cause" and for "any reason
or no reason". *Harp v. Administrator, Bureau of Unemploy.
Comp.,* 12 Ohio Misc. 34, 230 N.E.2d 376 (1967); *Portable
Electric Tools, Inc. v. NLRB,* 309 F.2d 423 (7th Cir. 1962);
*Reale v. International Bus. Mach. Corp.,* 34 App. Div. 2d 936,
311 N.Y.S.2d 767 (1970); *Mallard v. Boring,* 182 Cal. App.
2d 390, 6 Cal. Rptr. 171 (1960); *Swaffield v. Universal Ecsco
Corp.,* 271 Cal. App. 2d 147, 76 Cal. Rptr. 680 (1969).