No. 82-468

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

---

MARLENE S. GATES,

        Plaintiff and Appellant,

  -vs-

LIFE OF MONTANA INSURANCE COMPANY,

        Defendant and Respondent.

---

Appeal from:  District Court of the Eighteenth Judicial District,
In and for the County of Gallatin,
The Honorable Jack D. Shanstrom, Judge presiding.

Counsel of Record:

    For Appellant:

        Wellcome & Frost; Page Wellcome argued, Bozeman,
Montana

    For Respondent:

        Landoe, Brown, Planalp, Kommers & Lineberger;
Gene I. Brown argued, Bozeman, Montana

---

Submitted:  June 6, 1983

Decided:  August 5, 1983

Filed:  AUG 5 1983

*Ethel M. Harrison*

                Clerk

Mr. Justice Frank B. Morrison, Jr. delivered the Opinion of the Court.

Plaintiff brought this action to recover damages for breach of the covenant of good faith and fair dealing implicit in an at-will, employment contract. Summary judgment for defendant was reversed in Gates v. Life of Montana (1982), ____ Mont. ____, 638 P.2d 1063, 39 St.Rep. 16. The case was remanded for trial and resulted in a jury verdict in favor of plaintiff for $1,891 in compensatory damages and $50,000 in punitive damages. The trial court entered judgment for plaintiff on compensatory damages but entered judgment notwithstanding the verdict in favor of defendant on punitive damages. Plaintiff appeals from the granting of the judgment n.o.v.

Appellant commenced employment as a cashier with respondent on July 29, 1976, under an oral contract of indefinite duration. On October 19, 1979, she was called to meet with her supervisor, Roger Syverson, and without prior warning she was given the option of resigning or being fired. She testified that while in a distraught condition and under duress she signed a letter of resignation which was handed to her by Syverson. Appellant stated that she signed the letter of resignation because she thought it would be better for her record and because Syverson told her he would give her a letter of recommendation so that she could be reemployed.

Appellant went home and discussed the situation with her husband who advised her to retrieve the letter of resignation and inform her supervisor that she was not resigning. Appellant stated that she immediately called Syverson and demanded the letter be returned and that he promised to do so. Syverson testified that she only requested a photocopy of the letter.

2

Respondent's witnesses testified appellant was discharged for carelessness, incompetency and insubordination. In the first appeal we held there was a submissible jury issue on breach of the implied covenant of fair dealing in that appellant was discharged without warning and an opportunity for hearing. The jury here found that this covenant was indeed breached and awarded damages.

On appeal, we are concerned with two issues. First, can punitive damages be awarded for breach of the covenant to deal fairly? Secondly, does the evidence here create a jury issue on punitive damages?

In Lipinski v. Title Insurance Co. (1982), ____ Mont. ____, 655 P.2d 970, 39 St.Rep. 2283, this Court held that punitive damages could be assessed for bad faith insurance practices in absence of a statutory violation. We said in Lipinski:

> "Should there be any doubt, we now expressly hold that insurance companies have a duty to act in good faith with their insureds, and that this duty exists independent of the insurance contract and independent of statute. Any statements in our cases, to the extent they may be or appear to be in conflict with this holding, are expressly overruled."

Likewise, punitive damages may be assessed for breach of the obligation owed to deal fairly with an employee, if the provisions of section 27-1-221, MCA, are satisfied. That section provides:

> "In any action for a breach of an obligation not arising from contract where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, the jury, in addition to the actual damages, may give damages for the sake of example and by way of punishing the defendant." (emphasis added)

An action for breach of an implied covenant of fair dealing, at first blush, may sound both in contract and tort. The duty arises out of the employment relationship yet the

3

duty exists apart from, and in addition to, any terms agreed to by the parties. In this respect, the duty is much like the duty to act in good faith in discharging insurance contractual obligations. See Lipinski v. Title Ins. Co., supra. The duty is imposed by operation of law and therefore its breach should find a remedy in tort. Flint and Walling Mfg. Co.v. Beckette (1906), 167 Ind. 491, 498, 79 N.E. 503, 505. Also see W. Prosser, Law of Torts (4th ed. 1971), §92 at 617-618.

We hold that section 27-1-221, MCA, only exempts breach of contract actions from its provisions. Breach of the duty owed to deal fairly and in good faith in the employment relationship is a tort for which punitive damages can be recovered if defendant's conduct is sufficiently culpable.

We must examine the record in this case to determine whether there is evidence which would permit a jury to find malice, oppression or fraud attributable to the defendant. Motions for judgment notwithstanding the verdict are only to be granted when there is a complete absence of any credible evidence to support the verdict. All evidence and all inferences drawn therefrom must be considered in the light most favorable to this appellant. Barmeyer v. Montana Power Company (1983), _____ Mont. _____, 657 P.2d 594, 40 St.Rep. 23. "The courts will exercise the greatest self-restraint in interfering with the constitutionally mandated processes of jury decision." Barmeyer at 40 St.Rep. 25; Jacques vs. Montana National Guard (1982), _____ Mont. _____, 649 P.2d 1319, 1325-26, 39 St.Rep. 1565, 1573-74.

With these rules in mind we review the testimony upon which appellant must necessarily rely in her contention that a jury issue was created on the matter of punitive damages. We have divided the testimony which was offered to show that a letter of resignation was coerced by misrepresentation.

4

Secondly, we refer to that testimony bearing upon the issue of whether appellant's supervisor agreed to return the resignation letter and then subsequently failed to do so.

With resepect to the conversation surrounding appellant's tendering a resignation letter, appellant testified as follows:

"Q. And did he point out to you that he would give you this letter of recommendation?

"A. Yes, he did, and he even stated that I was a good worker, he had nothing against me and that he would give me a letter of recommendation.

"Q. And did you understand by that that he would give you a positive letter of recommendation?

"A. Yes.

"Q. Not merely as he has said a statement that you had worked for two or three years?

"A. That's right."

Syverson, appellant's supervisor, testified that he offered to give appellant a letter of recommendation if she resigned. However, he testified that he only planned to give her a letter which would state that appellant was employed by Life of Montana Insurance Company; he never intended to provide appellant with a favorable letter of recommendation. There was evidence from which the jury might infer that appellant understood she was to receive a favorable letter of recommendation and that Syverson allowed her to resign on this basis. By way of deposition, Syverson testified:

"Q. And then I asked you finally, "Question: Don't you think she understood when you said, 'We will give you a letter of recommendation,' that you would give her a favorable letter or recommendation to a subsequent employer?

And your answer to that was what?

"A. At line 15, Answer: I believe so."

From the foregoing the jury could have found that (1) Syverson acting for defendant told appellant if she resigned

she would receive a favorable letter of recommendation in order to obtain subsequent employment; (2) appellant reasonably expected to receive a favorable letter of recommendation to assist her in gaining reemployment; (3) appellant relied upon this representation and tendered her resignation; (4) Syverson never intended to give a favorable letter of recommendation to appellant. This evidence was sufficient for the jury to find fraud, oppression or malice.

Additional evidence supports appellant's position. After appellant returned home her husband advised her to demand return of the resignation letter. Appellant testified she immediately called Syverson and discussed the resignation letter. Her testimony follows:

"Q. And what did you say?

"A. I told him that I had discussed this with my husband and that it was my prerogative that I could ask for my letter of resignation back because I had no intentions of resigning.

"Q. And what did Mr. Syverson say to you?

"A. He indicated to me that he wanted to keep the letter over the weekend and that on Monday he would mail it to me.

"Q. He would mail you the letter of resignation?

"A. He would mail me the original copy of the letter of resignation.

"Q. Now, when we are talking here, are the original and copy two different things?

"A. On the original letter?

"Q. The original letter that you had signed?

"A. Yes.

"Q. Did you make clear to him that that's what you wanted back?

"A. Yes, I did.

"Q. Because you said you didn't intend to resign?

"A. That's right."

Appellant testified that Syverson promised to send her the letter of resignation. Appellant's testimony was corroborated by her husband who testified that he heard appellant, in a telephone conversation with Syverson, demand return of the resignation letter. The letter was never returned. Syverson's position at trial was that he only agreed to give appellant a copy of the letter.

From this evidence the jury could infer that (1) appellant demanded return of the resignation letter; (2) Syverson acting on behalf of respondent said that the letter would be returned; (3) Syverson never intended to return the resignation letter to appellant. This evidence, when considered with the testimony surrounding the giving of the resignation letter, supports an award of punitive damages.

Respondent argues that it should not be liable for punitive damages for terminating appellant without warning because at the time of appellant's termination there was an absolute right to fire without any type of process. Respondent asserts that new legal rights were given to appellant in the first appeal of this case and that respondent could not have known of the duty it owed appellant at the time of her termination.

Respondent is not being assessed punitive damages for failing to provide a warning prior to the firing. Rather respondent's conduct in obtaining the letter of resignation and refusing appellant's demand for return forms the basis for a jury finding of fraud, oppression or malice.

An employer stands to gain by an employee's resignation and such gain may be at the employee's expense. Resignation, rather than discharge, may protect an employer from immediately becoming liable for unemployment compensation benefits. Furthermore, the employer may, by obtaining a

letter of resignation, be insulating itself from a claim of wrongful discharge.

The courts must vigilantly assure that employers, as well as employees, are treated fairly. The sting of punitive damages will only be sanctioned where there is evidence that the tort feasor's conduct rose to a level of oppression, fraud or malice. Here we have a close case. However, when the evidence is viewed in a light most favorable to the employee, there is sufficient evidence for a jury to find that employer's conduct rose to the requisite level of culpability.

We reverse the granting of judgment notwithstanding the verdict and remand to the trial court with directions to reinstate the award of punitive damages.

Justice

We concur:

Chief Justice

Justices

8

Mr. Justice L. C. Gulbrandson dissenting:

I respectfully dissent.

I would affirm the District Court setting aside the award of punitive damages.

In the first appeal of this case, Gates v. Life of Montana, (1982), 638 P.2d 1063, 39 St.Rep. 16, this Court stated:

> "The circumstances of this case are that the employee entered into an employment contract terminable at the will of either party at any time. The employer later promulgated a handbook of personnel policies establishing certain procedures with regard to terminations. The employer need not have done so, but presumably sought to secure an orderly, cooperative and loyal work force by establishing uniform policies. The employee having faith that she would be treated fairly, then developed the peace of mind associated with job security. If the employer has failed to follow its own policies, the peace of mind of its employees is shattered and an injustice is done.
>
> "We hold that a covenant of good faith and fair dealing was implied in the employment contract of the appellant. There remains a genuine issue of material fact which precludes a summary judgment, i.e. whether the respondent failed to afford appellant the process required and if so, whether the respondent thereby breached the covenant of good faith and fair dealing.
>
> "As to all other claims against the respondent, however, summary judgment was properly entered. The District Court correctly concluded that appellant's claim in tort for wrongful discharge is unsupported by any showing of a violation of public policy as required under Keneally v. Orgain, supra.
>
> "Gates' claim for intentional infliction of emotional distress must also fail. The uncontradicted facts show that she was 'rather disturbed' and 'kind of in shock.' Under any known standard these allegations are insufficient to entitle her to recover. Kelly v. Lowney & Williams, Inc. (1942), 113 Mont. 385, 126 P.2d 486; Helton v. Reserve Life Insurance Co. (D.Mont., 1975), 399 F.Supp. 1322." 638 P.2d at 1067, 39 St.Rep. at 20-21.

The majority, in its valiant and successful effort to classify the conduct of the defendant as tortuous, states:

> "Respondent is not being assessed punitive damages for failing to provide a warning prior to the firing. Rather, respondent's conduct in obtaining the letter of resignation and refusing appellant's demand for return, forms

the basis for a jury finding of fraud, oppression, or malice."

I note that jury instruction twenty-three reads:

"You are instructed that the letter of resignation dated October 19, 1979, became the property of defendant Life of Montana, and defendant Life of Montana was under no legal obligation to return the letter of resignation to the plaintiff."

That was the only instruction given the jury where the letter of resignation was mentioned.

The case was obviously submitted and argued by plaintiff to the jury on the basis that liability also resulted from termination without notice. (See instructions no. 17, 19, and 21, which generally state that liability can arise from failure to follow established company policy.)

If the jury followed instruction no. 23 (no duty of defendant to return the letter of resignation) and if, as the majority states, the respondent is not being assessed punitive damages for failing to provide a warning prior to the firing, then the award must be based on the defendant's conduct in obtaining the letter of resignation.

In that regard the plaintiff Marlene Gates testified as follows:

"Q. Have you ever considered why you would be given that option, the resigning or being fired?
A. No.

"Q. Well, if he wanted to get rid of you, it would have been simple enough to say, 'You're fired,' wouldn't it?
A. Yes.

"Q. But he allowed you to resign.
A. Yes.

"Q. And did you think that over? Did you think over that decision of whether you should resign or be fired?
A. Yes.

"Q. How long did you think it over?
A. Well, I sat there I suppose it was minutes, you know. It was after five o'clock. I was wanting to get home and I'm sure he was wanting to get out of the office, and several things went through my mind, and I had to make a decision one way or the other.

"Q. You decided to resign.
A. That's right.

"Q. Why was that?
A. Because I thought it would look better for my record, and I'm sure it wouldn't be very good for their record to be known to be firing people.

"Q. You were concerned about how it would look for you?
A. Yes.

"Q. If you signed the letter of resignation, you could tell people, 'I resigned,' and you wouldn't have to say, 'I was fired,' right?
A. Right.

"Q. And also, when you went out to seek another job, you wouldn't have to say you were fired from your last one. You could say you resigned.
A. That's right.

"Q. So that was done as a benefit to you, is that right?
A. Right.

". . .

"Q. Now, when you went into this meeting with Roger Syverson when you were terminated, was there any loud talk or loud language?
A. No, there was not.

"Q. Was the conversation calm and businesslike?
A. Yes.

"Q. Were you nervous?
A. Yes.

"Q. Was Roger nervous?
A. He appeared to be very nervous, yes.

"Q. Would you tell us which of you were the most nervous?
A. I didn't weigh it out, no.

"Q. At least you could tell obviously that Mr. Syverson was nervous about this whole situation?
A. Yes.

"Q. Did he intimidate you?
A. No.

"Q. Did you intimidate him?
A. I don't believe I did.

"Q. Now, when you were asked to make a decision whether you wanted to resign or be fired, you thought that over pretty closely?
A. Yes, I did.

"Q. And your decision was that you preferred to resign?
A. Yes.

"Q. And you have, at that time you felt that was a good decision?
A. Well, it was the better decision, yes.

"Q. And it was based on your determination that with the letter of resignation, you would be better able to get a job, plus it would be easier to handle questions of fellow employees and friends?
A. Yes.

"Q. Those were your reasons for signing the letter of resignation?
A. Yes.

"Q. And when you left the office that afternoon, October 19, 1979, you had concluded that that was the best thing to do.
A. Yes."

The majority opinion states: "the sting of punitive damages will only be sanctioned where there is evidence that the tortfeasor's conduct rose to a level of oppression, fraud, or malice."

I do not find that oppressive level of conduct and neither did the trial judge when setting aside the award for punitive damage. His memorandum of September 28, 1982, stated: "in this case, I find no evidence that the defendant knowingly violated any duty to the plaintiff. There is no evidence that the defendant acted maliciously, intentionally, or willfully, and therefore the claim for punitive damages must fail."

This Court, in the first Gates opinion, correctly identified the threshold question of whether the employee's resignation was voluntary. Unfortunately, the jury was not instructed on this point and no special verdict was requested.

In the first Gates decision, the Court cited Molinar v. Western Electric Company (1st Cir. 1975), 525 F.2d 521, cert. den., (1976), 424 U.S. 978, 96 S.Ct. 1485, 47 L.Ed.2d 748, where the court decided the applicable rule that "an employee who voluntarily resigns cannot maintain a cause of action for wrongful discharge." The court there stated:

"A more difficult issue is whether Molinar's letter of resignation raised a jury issue of voluntariness. Molinar argues that he was induced to resign by the fraudulent promise that if he did so he would receive good recommendations.

- 12 -

"...

"[where] . . . [a] voluntary resignation bars a suit for wrongful discharge, the following standard has been laid down:

"'Even where the employee is told that he must choose between resignation and separation, the subsequent choice of resignation is not coerced unless the employee can show that his superior knew or believed that the reasons for the proposed separation could not be substantiated. . . .'"

"Cosby v. United States, [(1969 Ct.Cl.), 417 F.2d 1345] at 1355. This standard, which we think New York would adopt, limits a claim of duress to resignations extorted as a cover for wrongdoing, and recognizes that resignations in lieu of discharge may in many other instances reflect a mutually beneficial, good faith composition between an employer and employee having different views as to what each owes to the other. Thus, here, for Molinar's resignation to be treated as coerced and legally ineffective, it must be shown not only that the projected discharge would amount to a legal breach of contract but that there was bad faith, in that Western Electric knew or believed that the discharge could not be substantiated."

In my view, the majority, by extending the original Gates decision, has set the stage for a "just cause standard for at-will employees," which I believe is a legislative rather than a judicial function.

Section 39-2-503, MCA, provides that employment, having no specified term, may be terminated at the will of either party on notice to each other. This section codifies the long-established, but recently questioned, "at-will" rule. Although this Court has recognized that this rule may be outdated, we have also recognized that "it is uniquely a province of the legislature to change it." Reiter v. Yellowstone County (1981), ____ Mont. ____, 627 P.2d 845, 849, 38 St.Rep. 686, 690.

In Reiter, we noted that because of the operation of section 39-2-503, MCA, the at-will employee was not employed on a "discharge for cause only" basis. We stated, "assuming arguendo that appellant had an implied contract with an implied covenant of good faith, the employer did not act in bad faith because its conduct was statutorily permissible." 627 P.2d at 849-850, 38

- 13 -

St.Rep. at 690.

In other words, under section 39-2-503, MCA, an employer or employee could terminate employment for any or all reasons, provided the reasons or manner of termination did not violate public policy. See Keneally v. Orgain (1980), ____ Mont. ____, 606 P.2d 127, 37 St.Rep. 154.

In the prior discussion of this case, this Court determined that a covenant of good faith and fair dealing was implied in the parties' oral, at-will, employment contract. The basis for this holding was the employer's promulgation of an employees' handbook, two years after Gates began employment. The handbook provided certain guidelines for termination of employees. We stated that Gates had a cause of action because "if the employer failed to follow its own policies, the peace of mind of its employees is shattered and an injustice is done." 638 P.2d at 1067, 39 St.Rep. at 20. We then found two genuine issues of material fact: (1) whether respondent failed to afford appellant Gates the process required; and (2) whether the respondent thereby breached the covenant of good faith and fair dealing.

The Court had also decided in the prior decision that the guidelines in the employer handbook regarding notice prior to termination, were not enforceable as contract rights. We further determined that appellant's claim in tort for wrongful discharge was properly dismissed because it was not supported by any showing of a violation of public policy.

The majority cites Lipinski v. Title Insurance Co. (1982), ____ Mont. ____ , 655 P.2d 970, 39 St.Rep. 2283, for the assessment of punitive damages in bad faith cases.

Insurance cases upholding a breach of the implied covenant of good faith and fair dealing did not evolve under the same considerations as cases discussing a breach of the implied covenant in employment contracts. In the insurance cases, the courts look to whether the insurance company, with malice, fraud or oppression, abused its duty to act in good faith. The "bad

- 14 -

faith" employment cases maintain a higher standard in that the courts generally look for a violation of public policy on the part of the employer. See discussion in Pierce v. Orth Pharmaceutical Corp. (1980), 84 N.J. 58, 417 A.2d 505, 12 ALR4th 520, and Annot. 12 ALR4th 544, (1982).

Most courts recognizing a cause of action based on a discharge that offends public policy have grounded that action in tort, while only a few have relied on an implied contract theory of recovery. Compare Tameny v. Atlantic Richfield Co. (1980), 27 Cal.3d 167, 610 P.2d 1330, 164 Cal.Rptr. 839, (recognizing a tort action for wrongful discharge when employee was terminated because he refused to commit a criminal act); Nees v. Hooks (1975), 272 Or. 210, 536 P.2d 512 (recognizing a tort action because an employee was dismissed for serving jury duty); and Kelsay v. Motorola (1978), 74 Ill.2d 172, 364 N.E.2d 353 (recognizing a tort action when employee was dismissed for filing a workers' compensation claim); with Fortune v. National Cash Register Co. (1977), 373 Mass. 96, 364 N.E.2d 1251 (recognizing a contract action when employee terminated in order not to receive earned bonuses or commissions); and Monge v. Beebe Rubber Co. (1974), 114 N.H. 130, 316 A.2d 549 (recognizing contract action and limiting damages to those for breach of contract when employee terminated for refusal to date foreman). For a more complete list, see Smith v. Atlas Off-Shore Boat Service (5th Cir. 1981), 653 F.2d 1057, 1061 N.9.

In the prior decision, this Court relied on Fortune and Monge in recognizing that appellant has a cause of action under an implied covenant of good faith and fair dealing. Both Fortune and Monge grounded their decisions in contract, not tort law. Damages were limited to those allowed only for breach of contract. Moreover, the decision in Monge was later limited by the New Hampshire Supreme Court to situations where the termination violated public policy. See Howard v. Dorr Woolen Co. (1980), 120 N.H. 295, 414 A.2d 1273.

By allowing punitive damages in this case, the majority has identified, and approved, an independent tort of bad faith in at-will employment contracts. All other jurisdictions do so only when the termination violates public policy.

I note further that the termination in question occurred October 19, 1979. The Reiter decision, supra, acknowledging that "the employer did not act in bad faith because its conduct was statutorily permissible," was dated May 4, 1981. The Keneally decision, supra, was dated January 30, 1980, and this Court, citing Percival v. General Motors Corp. (E.D. Mo. 1975), 400 F.Supp. 1322, stated:

> "Thus, that court noted, correctly, that a discharge by an employer in a contract terminable at will does not give rise to a claim for wrongful discharge in the ordinary sense, though the firing or the termination may have been unjustified. It is only when a public policy has been violated in connection with the wrongful discharge that the cause of action arises." 606 P.2d at 129, 37 St.Rep. at 157.

In view of the fact that the termination in question occurred long before the above two decisions of this Court, I would expect this Court to apply the law as stated in those decisions to this case. The Gates decision, supra, wherein the doctrine of implied covenant of good faith was first approved, was dated January 5, 1982. I do not object to the application of this doctrine retroactively for the determination of compensatory damages, but I do not agree that it should be the basis of punitive damages. I note, with approval, the citation by the trial judge in his memorandum of September 28, 1982, of Nees v. Hooks, supra. In that case an employee was discharged for missing work to attend jury duty, a clear violation of public policy. The Oregon court allowed compensatory damages, but would not allow the awarding of punitive damages. The Oregon court stated as follows:

> "There is one factor, however, which is present in this case which has not been present in past cases approving the submission of the punitive damage issue to the jury. In our past cases, the defendant knew his conduct was regarded as culpable and would give rise to a cause of action because of past judicial

decisions or legislation. For example: An automobile dealer turning back the odometer to deceive the purchaser, Lewis v. Worldwide Imports, 238 Or. 580, 395 P.2d 922 (1964); a finance company converting an automobile by wrongful repossession, Pelton v. Gen. Motors Accept. Corp., 139 Or. 198, 7 P.2d 263, 9 P.2d 128 (1932); and a drunken driver colliding with another car, Harrell v. Ames, 265 Or. 183, 508 P.2d 211 (1973).

"Until the trial court's ruling in this case and our affirmance there was no judicial decision that an employer was liable if he discharged an employee because she served jury duty. As we earlier stated, the general rule known to employers and lawyers alike is that absent contract or statute, an employer can discharge an employee for any reason without incurring liability.

"If we held that punitive damages could be awarded in the present case, we would be permitting the jury to punish defendants for conduct which they could not have determined beforehand was even actionable. The assessment of punitive damages has some of the same functions as the sanctions of criminal law. . . . The sanctions of the criminal law cannot constitutionally be imposed when the criminality of the conduct is not capable of being known beforehand." 272 Or. 210, 536 P.2d at 516-17.

I would hold that punitive damages are not allowable where there has been no showing that the termination of an at-will employee violated public policy, until such time as the legislature repeals or amends section 39-2-503, MCA.

_____
Justice

I concur in the foregoing dissent of Mr. Justice Gulbrandson:

_____
Justice

- 17 -

Mr. Justice Fred J. Weber dissents as follows:

I join in the dissent of Justice Gulbrandson. In addition I dissent as follows:

With regard to the covenant of good faith, the majority opinion holds in part:

> "Breach of the covenant to deal fairly is, simply stated, breach of a legal duty to deal fairly. Breach of the duty owed to deal fairly in the employment relationship is a tort for which punitive damages can be recovered if defendant's conduct is sufficiently culpable."

I am unable to understand how the majority has arrived at that conclusion.

The majority refers to section 27-1-221, MCA, which in pertinent part states:

> "In any action for a breach of an obligation <u>not arising from contract</u> . . . the jury . . . may give damages for the sake of example and by way of punishing the defendant." (Emphasis added.)

The basic question here is whether there is a breach of an obligation <u>not arising from contract</u>.

In our original opinion, Gates v. Life of Montana Ins. Co. (1982), _____ Mont. _____, 638 P.2d 1063 at 1067, we stated the key holding:

> "We hold that a covenant of good faith and fair dealing was implied in the employment contract of the appellant."

In reaching that conclusion, we pointed out that a general principle of good faith and fair dealing has been recognized under the Uniform Commercial Code and also has been recognized in insurance contracts. We also pointed out that recent decisions in other jurisdictions support the proposition that a covenant of good faith and fair dealing is implied in employment contracts. Since we then concluded that in the <u>Gates</u> case a covenant of good faith and fair dealing was implied in the employment contract, it seems

- 18 -

clear that such a covenant becomes a part of the employment contract as if it were set forth in writing.

An implied covenant can be breached just as a covenant expressly stated in the contract can be breached. The present case is an action for breach of the covenant of good faith and fair dealing, arising from the contract from which that covenant is implied. Comparing the contractual covenant of good faith and fair dealing with the punitive damages section, it seems clear that breach of such a contractual obligation does not justify an award of punitive damages under the express terms of the statute.

The majority holds that the code section exempts only breach of contract actions from its provisions. Essentially, that is the nature of the present claim for relief.

The present holding has little relationship to our original holding in Gates. There we held that a covenant of good faith and fair dealing was implied in the employment contract. We remanded the cause to determine if the employee had been given due process and, if so, whether a breach of the covenant of good faith and fair dealing resulted. If I understand the majority, we now disregard the contractual relationship and its implied covenant, and hold that there is a duty to deal fairly, which apparently does not arise from the contract itself, and the breach of such duty is a tort for which punitive damages can be recovered.

While I agree that it may be reasonable to amend section 27-1-221, MCA, to allow punitive damages for breach of an obligation arising from contract, we have traveled a long way to arrive at a conclusion which should have been left to the legislature.

Justice

- 19 -