Bernard **GOLDSTEIN**, as Assignee of La Boucherie Bernard Ltd., and Individually, Plaintiff,

v.

**S & A RESTAURANT CORPORATION**, Defendant.

Civ. A. No. 84–2093.

United States District Court, District of Columbia.

Oct. 30, 1985.

Lawrence Singer, Roberts & Singer, Washington, D.C., for plaintiff.

Joel R. Kaswell, Kathryn R. Schmeltzer, Barry H. Gottfried, Fisher, Wayland, Cooper & Leader, Washington, D.C., for defendant.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

This matter comes before the Court on defendant's Motion for Summary Judgment. After consideration of the pleadings and the record, and for the reasons outlined below, the Court grants defendant's motion.

## I.

### BACKGROUND

Plaintiff, Bernard Goldstein, is the majority stockholder of La Boucherie Bernard Ltd. ("La Boucherie"),[1] a District of Columbia corporation, now bankrupt. Defendant Steak & Ale Restaurant ("S & A") is a Delaware corporation, maintaining its principal place of business in Texas. La Boucherie and S & A entered into an arrangement whereby La Boucherie was to

---

1. Originally, Goldstein owned and operated a business known as District Hotel Supply, Inc. In 1975, he formed La Boucherie and, in 1976, merged the two corporations under the single name "La Boucherie Bernard, Ltd." Goldstein is suing as assignee of the now defunct company.

supply meat for S & A restaurants throughout the eastern United States and in Texas. By 1981, La Boucherie was supplying approximately 120 such restaurants.

At all relevant times, the arrangement between the parties operated as follows. S & A purchased raw meat, which it stored in warehouses located in Nebraska and Colorado. La Boucherie would draw from this inventory, ship the meat to its Maryland warehouse, and after processing the meat, distribute it to designated S & A restaurants. Within seven days of receiving the meat at its warehouse, La Boucherie was to pay S & A for the raw meat, receiving payment later for the processed meat that it delivered to the individual S & A restaurants.

In the spring of 1981, La Boucherie fell behind in its payments to S & A. By his own admission, Goldstein owed $1.15 million by June 24, 1981. (Deposition of Bernard Goldstein, Mar. 21, 1985, vol. I, at 148–49 and Exhibit 16 thereto) ("Goldstein depo."). This arrearage was caused, at least in part, by his decision to divert funds to his real estate ventures. Goldstein depo., vol. I, at 51–52. Meanwhile, S & A had been making substantial payments to La Boucherie, remitting approximately $3.2 million between April 1 and June 19, 1981.

On June 22, 1981, to cover its account through May 31, 1981, La Boucherie, through Goldstein, tendered three postdated checks. No current payments were made. Again on July 1, 1981, Goldstein tendered three more postdated checks to cover the previous month. This time, however, the checks were not accepted. Instead, S & A demanded and received from Goldstein a 30-day, $1 million note. Shortly thereafter, Goldstein left on a trip to Europe.

On July 10, 1981, while Goldstein was abroad, S & A removed approximately 60 restaurants from the role of outlets that were supplied by La Boucherie. On July 13, S & A filed suit in this Court, seeking to attach La Boucherie's inventory of meat held in Maryland. In return for S & A's voluntary dismissal of that suit, Robert Goldstein, Bernard Goldstein's son, executed an agreement with S & A, modifying their earlier arrangement. The agreement, dated July 14, 1981, acknowledged that La Boucherie owed S & A approximately $1.4 million, gave control of the Maryland inventory to S & A, contained a promise to pay S & A $1 million by August 4, 1981, and affirmed that that agreement was not in derogation of any other rights as between the parties.

Upon his return to this country, Goldstein Senior traveled to Dallas, Texas, where he signed another agreement, dated July 21, 1981, acknowledging an indebtedness of $1.3 million as well as a limitation of La Boucherie's service area to 59 restaurants, and stating that the current relationship between La Boucherie and S & A could be terminated upon ten days' notice. By the end of August 1981, La Boucherie paid S & A approximately $1 million, using borrowed funds.

In October 1981, S & A informed La Boucherie that the latter was being terminated as a supplier of meat[2] in ten days' time. After some negotiation, it was settled that La Boucherie was to continue as a supplier through December 1981. That agreement was confirmed in a letter dated October 19, 1981.

This action, filed in July 1984, seeks relief for what plaintiff believes was a wrongful termination in 1981 of its contractual relationship with S & A. Plaintiff's complaint[3] raises four causes of action. The first alleges breach of contract; the second, breach of fiduciary duties; the third, breach of a "duty of good faith and fair dealing"; and the fourth, misrepresentation. All four claims press the same theory of damages—that, because of defendant's alleged wrongdoing, La Boucherie lost profits, suffered injury to its business reputation, and was forced into bankruptcy. As recompense for these wrongs,

---

**2.** La Boucherie continued for a time to supply S & A with chicken products.

**3.** Plaintiff's Third Amended Complaint was filed May 17, 1985.

plaintiff seeks $12 million in compensatory and $50 million in punitive damages.

Crucial to plaintiff's theory of the case is his assertion that the agreements executed in July and October 1981 are the products of duress or undue influence and, hence, are nullities. Indeed, plaintiff admits in his pleadings that "what is principally in dispute are not the underlying facts but rather the interpretation of these facts and their application to the legal standards governing the issues to be resolved." Plaintiff's Statement of Facts to Which There is a Genuine Issue. In making this admission, plaintiff as much as concedes that this case is one that is ripe for summary adjudication.

## II.

## ANALYSIS

For defendant to prevail on summary judgment, he must show that there is no issue of material fact genuinely in dispute and that he is entitled to judgment as a matter of law, even when the facts, and all inferences to be drawn therefrom, are seen in the light most favorable to plaintiff. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Perry v. Block*, 684 F.2d 121, 126 (D.C.Cir. 1982); *Weisberg v. United States Dep't of Justice*, 627 F.2d 365, 368 (D.C.Cir.1980). As the moving party, moreover, defendant bears the burden of proof as to the absence of any issue of material fact, even if he would not have to bear that burden at trial. *Lee v. Flintkote Co.*, 593 F.2d 1275, 1281 nn. 34 & 35 (D.C.Cir.1979). Yet it is by no means unknown for a defendant to be granted summary judgment on a contract

action where, as here, the plaintiff seeks to avoid the force of a contractual agreement by raising the defense of fraud or duress. *See, e.g., Dresser v. Sunderland Apts. Tenants Assoc., Inc.*, 465 A.2d 835 (D.C. App.1983); *Sind v. Pollin*, 356 A.2d 653 (D.C.App.1976).

■ The terms of the written agreements in question present no ambiguity and require no extrinsic evidence to elucidate their meaning. Plaintiff seeks to avoid the effect of these writings by alleging that they were the products of duress, undue influence, or fraud. Yet a mere recitation of conclusory allegations is insufficient to raise a genuine issue of material fact where the record does not support those allegations. *Bloomgarden v. Coyer*, 479 F.2d 201, 208 (D.C.Cir.1973); *Richardson v. Rivers*, 335 F.2d 996, 999 (D.C.Cir. 1964); *Edwards v. Consol. Rail Corp.*, 567 F.Supp. 1087, 1091 (D.D.C.1983). *See also* Calamari & Perillo, *Contracts* § 9–39 (2d ed. 1977) (claim of unconscionability mandates hearing on merits only if real issues of fact raised). Where the nonmoving party raises factual issues irrelevant to the legal issues presented, the moving party is entitled to judgment as a matter of law.[4]

### A. Claims for Breach of Contract and "Duty of Good Faith and Fair Dealing"

In its first and third claims, plaintiff alleges that defendant's termination of plaintiff as a distributor constituted a breach of contract and of a "duty of good faith and fair dealing." Because modern contract law[5] looks upon every contractual relationship as embodying a duty of good faith and fair dealing, D.C.Code Ann. § 28:1–203 (Michie 1981 & Supp. 1985); *Restatement*

---

**4.** Plaintiff spends much time in his pleadings suggesting that S & A was somehow improperly motivated when it decided to terminate La Boucherie as a distributor. Such allegations are plainly not relevant and will not enable plaintiff to withstand summary judgment. *See, e.g., Grubel v. Union Mut. Life Ins. Co.*, 54 A.D.2d 686, 387 N.Y.S.2d 442 (1976) (absent wrongful threat, contracting party's motives irrelevant to analysis of duress or undue influence).

**5.** Since the instant case involves sales of goods, it is governed by the Uniform Commercial Code ("U.C.C."), as adopted in D.C.Code Ann. § 28:2–101 *et seq.* In situations that it does not expressly cover, however, the U.C.C. does not displace the common law of contracts. D.C.Code Ann. § 28:1–103; *G & R Corp. v. American Security & Trust Co.*, 523 F.2d 1164, 1171 (D.C.Cir.1975).

*(Second) of Contracts* § 205 (1981); A. Corbin, *Contracts* § 654A (Supp.1984), plaintiff's third claim is really part and parcel of his first claim.

Both parties presuppose the existence of a contract between them prior to the events of June-October 1981.[6] Yet if such a contract existed at all, it was, in the formal sense, only a contract at will.[7] Accordingly, under traditional contract principles, and under the U.C.C., it could be terminated by either party *at will.* D.C. Code Ann. § 28:2–309(2). Moreover, at least where one party is in breach, the wronged party can terminate the agreement without notice or warning. *See, e.g., Fromm Sales Co. v. Troy Sunshade Co.,* 159 A.2d 860, 862–63 (Md.1960) (termination of distributorship agreement proper where terminated party failed to meet its financial obligations). That La Boucherie was seriously in default by June 1981 is uncontested. Plaintiff nevertheless asserts in his pleadings that any default was "cured" and that S & A did not investigate La Boucherie's financial condition and, hence, lacked a "satisfactory business reason" for terminating the latter's distributorship. In pressing this theory, however, plaintiff misreads what is meant by "good faith" in a commercial setting.[8] " 'Good

faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." D.C.Code Ann. § 28:2–103(1)(b). All evidence in the record points to the fact that S & A was justifiably insecure about its continuing relationship with La Boucherie and the latter's ability to meet its financial obligations. S & A was not required to investigate La Boucherie's financial health, and its decision to terminate La Boucherie was well within the bounds of good faith. *Cf.* D.C.Code Ann. § 28:2–609(1) (party may suspend performance of contract until it receives adequate assurance of the other party's ability to perform).[9]

Plaintiff argues that the July 21 and October 19, 1981 agreements are unconscionable in that they were one-sided in their operation: defendant both terminated 59 of 120 restaurants that plaintiff supplied and arranged for the termination of the remaining restaurants upon 10 days' notice.[10] To this end, plaintiff cites D.C.Code Ann. § 28:2–302, which empowers courts to disregard the operation of unconscionable contracts or clauses therein. Ironically, however, if this Court were to disregard the two agreements, what would be left

6. Both parties point to a letter of May 8, 1981 as memorializing their contractual relationship. That letter only acknowledges a certain pricing agreement; it does not satisfy the applicable Statute of Frauds, D.C.Code Ann. § 28:3502.

7. Whether or not any contract entered into by La Boucherie and S & A was for a definite period or of indefinite duration, it was in any event not performable within one year and, hence, was unenforceable absent a signed writing. D.C.Code Ann. § 28:3502. No such writing setting forth the terms of any ongoing relationship between the parties has been produced for the Court. *See supra* note 6.

8. In the area of employment contracts, as well, an at-will agreement is terminable only in good faith. *See, e.g., Savodnik v. Korvettes, Inc.,* 488 F.Supp. 822, 824 (E.D.N.Y.1980); *Monge v. Beebe Rubber Co.,* 114 N.H. 130, 316 A.2d 549, 551 (N.H.1974); 3A A. Corbin, *Contracts* § 684 (1960 & Supp.1984).

9. That section of the Code, it should be noted, contemplates a situation where a definite contract, calling for a specific performance, has

been entered into and where one party has given some indication that it will not be able to perform its part of the bargain. In such a case, the other party may demand assurance of return performance before performing itself. The instant case, in contrast, involves an at-will arrangement, which, by definition, is terminable at any time, so long as the terminating party does not act in bad faith. A party in such a situation need not wait for assurances, while merely suspending its own performance.

10. Plaintiff states in his Opposition that the two agreements were unconscionable in that they provided for termination without notice, citing D.C.Code Ann. § 28:2–309. That provision only provides that an agreement dispensing with notice is invalid *if* its operation would be unconscionable; plaintiff begs the question. Moreover, the Court, having read both documents, is at a loss to divine why plaintiff asserts that neither agreement provided for notice, when both clearly did.

would be an arrangement terminable *at will,* not upon 10 days' notice.

Even apart from the fact that the July and October agreements did not diminish any rights that plaintiff possessed prior to the execution of those agreements, it cannot be said that those agreements were unconscionable. The principle embodied in U.C.C. § 2–302 is "one of the prevention of oppression and unfair surprise." Official Comment 1. Unconscionability presupposes both the absence of meaningful choice on the part of one party and contract terms unreasonably favorable to the other party. *Williams v. Walker-Thomas Furniture Co.,* 350 F.2d 445, 449 (D.C.Cir.1965); *cited in Neves v. Riley,* 447 F.Supp. 306, 309 (D.D.C.1978) and *Urban Investments, Inc. v. Branham,* 464 A.2d 93, 99 (D.C.App. 1983). For the most part, the doctrine of unconscionability is limited in its application to agreements that are so one-sided that it can be said that no real meeting of the minds ever occurred with regard to the contract or terms in question. Calamari & Perillo, *supra,* § 9–40. The doctrine was not intended to "disturb[ ] [the] allocation of risks because of superior bargaining power." *Id.* at 326 (citing U.C.C. § 2–302, Comment 1). A review of the documents in question, the parties' prior dealings with one another, and the record before the Court reveals no material fact that would support a finding that there is a genuine issue as to whether the two agreements were the product of a meeting of the minds.

■ In a related argument, plaintiff contends that the July and October agreements were the products of duress or undue influence and are, hence, unenforceable. Before discussing whether either agreement is voidable for duress, we note that plaintiff's reliance upon the doctrine of undue influence is clearly misplaced. "Un-

due influence is unfair persuasion of a party who is under the domination of the person exercising the persuasion or who by virtue of the relation between them is justified in assuming that that person will not act in a manner inconsistent with his welfare." *Restatement (Second) of Contracts* § 177(1). At the core of the doctrine is a concern for protecting a party who is either "subservient" to, or has placed trust in, another party. Calamari & Perillo, *supra,* § 9–10. In all cases, either some confidential relation between the parties exists,[11] or one party stands in such a weakened position in relation to the other that he is susceptible to unfair persuasion. Calamari & Perillo, *supra,* § 9–11; *Restatement (Second) of Contracts* § 177, Comment a. *See, e.g., Odorizzi v. Bloomfield School Dist.,* 246 Ca.App.2d 123, 54 Cal.Rptr. 533 (1966) (teacher accused of homosexuality coerced into resigning). It is hard to imagine how such an "astute [businessman]," Goldstein depo., vol. I, at 38–39, can assert that he was subservient to, or dependent upon, his trading partner.

■ As distinct from that of undue influence, the doctrine of duress focuses, not upon the relationship between the parties, but upon the means used by one party to gain the other's assent. Specifically, it is a settled principle of law that one party cannot threaten another if "the threat is a breach of the duty of good faith and fair dealing under a contract with the recipient." *Restatement (Second) of Contracts* § 176(1)(d).[12] Yet, "[h]ard bargaining between experienced adversaries of relatively equal power ought not to be discouraged. Parties are generally held to the resulting agreement, even though one has taken advantage of the other's adversity, as long as the contract has been dictated by general economic forces." *Restatement (Second) of Contracts* § 176, Comment f. To call into play the doctrine of duress requires

---

**11.** Such as that between husband and wife, or between clergyman and parishioner.

**12.** A threat is also improper if "the threatened act would harm the recipient and would not significantly benefit the party making the threat...." *Restatement (Second) of Contracts*

§ 176(2)(a). Inasmuch as plaintiff contends that the July and October agreements were lopsided, plaintiff cannot then argue that S & A did not "significantly benefit" from those agreements.

that a threat be wrongful. *Rizzi v. Fanelli*, 63 A.2d 872, 874 (D.C.Mun.App.1949). While "any threat which deprives a party to a contract of the free exercise of his will constitutes duress[,]" *id.* (citing 17 C.J.S. *Contracts* § 168), the modern trend is to focus upon the alternatives available to the party receiving the threat. *Restatement (Second) of Contracts* § 175(1) & Comment b (victim must have "no reasonable alternative").

Plaintiff maintains generally that S & A took advantage of La Boucherie's financial straits in order to wrest a hard bargain. Whether or not S & A actually took advantage of La Boucherie is not, however, a question that demands resolution by trial. "Financial pressures, even in the context of unequal bargaining power, do not constitute economic duress." *Grubel*, 387 N.Y. S.2d at 443. If the means used are themselves lawful—and no one argues that S & A is guilty of any illegality—proof of "business compulsion" requires "a showing that the victim's financial straits were *caused by* the other party." *National American Corp. v. Federal Republic of Nigeria*, 448 F.Supp. 622, 644 (S.D.N.Y.1978), *aff'd*, 597 F.2d 314 (2d Cir.1979) (emphasis added). The most that can be said here is that S & A may have threatened to terminate La Boucherie if the requisite documents were not signed. But since any contract existing between the parties was terminable at will, S & A, if it indeed made such a threat, did no more than threaten to exercise its rights under the existing contract. Such a threat does not amount to duress. *Board of Trustees of Nat'l Training School for Boys v. O.D. Wilson Co., Inc.*, 133 F.2d 399, 400 n. 4 (D.C.Cir.1943); *Blake Const. Co., Inc. v. C.J. Coakley Co., Inc.*, 431 A.2d 569, 577 n. 5 (D.C.App.1981); *Joseph F. Egan, Inc. v. City of New York*, 18 A.D.2d 357, 239 N.Y.S.2d 420, 423 (N.Y.App.Div. 1963). Even a threatened *breach* of contract is not coercive unless the threat, if carried out, would result in irreparable

harm to the threatened party. *Sind*, 356 A.2d at 657. Applying the law to the undisputed facts of this case, the Court can find no evidence to support a claim that La Boucherie was the victim of duress, economic or otherwise.[13]

Even if La Boucherie has been the victim of duress, "duress merely renders a contract voidable. Thereafter, the victim may ratify the agreement by accepting its benefits." *National American Corp.*, 448 F.Supp. at 645. *See also Blum v. Blum*, 59 Md.App. 584, 477 A.2d 289, 294 (1984); *Restatement (Second) of Contracts* § 175; Calamari & Perillo, *supra*, § 9–8. While delay in disaffirming a contract may preclude avoidance of the contract's operation, *Blum*, 477 A.2d at 294; *Egan*, 239 N.Y. S.2d at 423; *Restatement (Second) of Contracts* § 381, the acceptance of benefits under the contract necessarily bars denial of its validity. *National American Corp.*, 448 F.Supp. at 644; *Blum*, 477 A.2d at 294, *Grubel*, 387 N.Y.S.2d at 443, *Restatement (Second) of Contracts* § 380, § 381, Comment a. It was five months after signing the July 21 agreement, and two months after signing the October 19 agreement, that La Boucherie was terminated as a distributor. During that time, it is undisputed that La Boucherie continued to reap the benefits of its relationship with S & A. Consequently, La Boucherie must be said to have ratified the agreements in question.

**B. Claim for Breach of Fiduciary Duties**

■ In its second claim, plaintiff asserts that S & A breached fiduciary duties that it owed plaintiff by virtue of the "close relationship" between the parties. Such a claim simply does not lie where two business partners have dealt with one another at arm's length. *See Restatement (Second) of Contracts* § 177(1) and Comment a; Calamari & Perillo, *supra*, § 9–10. *Cf. Bell v. Bell*, 38 Md.App. 10, 379 A.2d 419, 423 (1977) (no fiduciary relationship existed

---

**13.** To the contrary, there is evidence in the record—from plaintiff's own testimony—that La Boucherie continued at "full production" until January 1, 1983. Deposition of Bernard Goldstein, In re Boucherie Bernard, Ltd., Case No. 83–108 (Aug. 11, 1983) at 16 (submitted as Exhibit 2 to Plaintiff's Statement of Material Facts).

between husband and wife when element of trust and confidence was lost); *Sind,* 356 A.2d at 655 (no fiduciary relationship between joint venture partners when they terminated agreement and when neither was in position of trust).

### C. Claim for Misrepresentation

In its fourth and final claim for relief, plaintiff maintains that, in soliciting the $1 million note, S & A misrepresented the fact that business relations were to continue as usual. We need not be concerned with whether S & A dealt with La Boucherie truthfully or not, for plaintiff fails in other respects to make out a prima facie case of misrepresentation. In order for plaintiff to survive summary judgment on this claim, there would have to be in the record some evidence that plaintiff took action in reliance upon some alleged misrepresentation by defendant and that, as a result of this action, plaintiff incurred damages. *Dresser,* 465 A.2d at 839. No such detrimental reliance presents itself in the record before the Court. Even if plaintiff tendered his note in the hopes that past defaults would be forgiven, La Boucherie owed to S & A a sum equivalent to the face value of the note, as plaintiff has acknowledged. Ironically, plaintiff asserts elsewhere in his pleadings that the note was in satisfaction for money owed. If plaintiff owed the monies represented by the note and would have had to tender payment eventually, it cannot be said either that plaintiff took action in reliance upon any alleged misrepresentation or that plaintiff sustained any injury as a result of taking that action.[14] In the absence of such detrimental reliance, plaintiff fails to state a claim. *King v. Indus. Bank of Washington,* 474 A.2d 151, 155 (D.C.App.1984).

### III.

### CONCLUSION

Plaintiff and defendant entered into a series of unambiguous agreements, by

whose operation plaintiff was put in the situation he now complains of. Because the record reveals nothing but that plaintiff was a sophisticated businessman who could look after his own interests, plaintiff cannot avail himself of any doctrinal shield with which to deflect the force of those agreements. Accordingly, on the undisputed facts of the record, defendant is entitled to judgment as a matter of law.

An appropriate order will be entered.

---

14. Plaintiff contends that, had S & A informed him of its "true intent," he would have cancelled his trip to Europe and, presumably would have smoothed things over with S & A, thus avoiding the eventual termination of his distributorship. Opposition at 41. Such a claim is too speculative to merit serious consideration, much less a trial.