766 P.2d 768
George Ronald CLEMENT, Plaintiff–Appellant,

v.

FARMERS INSURANCE EXCHANGE; Truck Insurance Exchange; Fire Insurance Exchange; Mid Century Insurance Co.; Farmers New World Life Insurance Co.; and Farmers Insurance Co. of Idaho, Defendants–Respondents.

No. 17004.

Supreme Court of Idaho.

Nov. 22, 1988.

SHEPARD, Chief Justice.

This is an appeal from a summary judgment granted to defendants-respondents Farmers Insurance Exchange, et al., in an action brought by plaintiff-appellant Clement, asserting a breach of and a wrongful termination of a written contract designating Clement as an insurance agent for Farmers Insurance. We affirm.

In 1977 Clement and Farmers Insurance entered into a contract wherein Clement agreed to sell insurance as an agent for Farmers. The contract was silent as to duration, but expressly permitted either party to terminate the contract after a 90–day advance notice of the termination.

At a later time Farmers establsihed a sales quota system, and Clement was identified as a low-producing agent. Clement was so informed and was required to upgrade his sales activity to that of a full time agent, or resign. After discussions and negotiations Farmers, in October, 1983, informed Clement that pursuant to the terms of the written contract, the agency with Clement would be terminated in 90 days. Clement thereafter commenced this action, arguing that the contract at issue here was one for employment-at-will, and as such contains an implied covenant of good faith and fair dealing which modifies the express terms of the contract allowing termination by either party upon 90–day notice. Hence, he argues that termination of the contract may be permitted only for good cause, and Farmers is guilty of breach of the contract despite compliance with the express terms of the contract. Clement also asserted that Farmers' termination of the contract was in contravention of public policy, thereby giving rise to an action in tort for wrongful termination. Clement lastly argues that the original written contract was modified when representatives of Farmers caused Clement to believe he could only be terminated with good cause, and that no cause existed for such termination. In light of the alleged modifications, Clement asserts breach of the contract by Farmers.

Grover & Walker, Chartered, Idaho Falls, for plaintiff-appellant. Keith M. Walker argued.

Elam, Burke and Boyd, Boise, for defendants-respondents. Bobbi K. Dominick argued.

As noted above, much of Clement's argument is couched in terms of breach of an employment-at-will contract. Obviously such contractual relationships arise only from an employer/employee circumstance. Clement's own characterization in his complaint is that he was, and is, an independent contractor. That assertion of independent contract status is supported in *Anderson v. Farm Bureau Mutual Insurance Co. of Idaho,* 112 Idaho 461, 732 P.2d 699 (Ct.App. 1987).

■ Nevertheless we are urged in the instant case to hold that an express written provision of a contract between the parties which permits either party to terminate the contractual relationship upon 90–day notice is invalid and inoperative unless the terminating party has good cause. It is argued that an implied covenant of good faith and fair dealing so requires the invalidating of an express termination provision of a written contract. We decline to so hold. Here, there is no assertion that the contract was entered into by either party on anything but a voluntary basis. There is no allegation of misrepresentation or fraud in the negotiations or the execution of the contract. The contract provides no terms as to duration except the provision providing for termination by either party upon 90–days notice. In such a circumstance either party may be unwilling to enter into such an ongoing relationship without the ability to terminate at will. There may be a myriad of reasons on either side which make such a right of termination desirable or necessary. Presumably the right of termination being an express provision of the written contract, it was bargained for, and considered necessary by both parties. The law generally requires that a contractual relationship be defined with reasonable certainty, and to be enforceable a contract must be sufficiently definite in its terms that the performance to be rendered by each party can be ascertained with reasonable certainty. *Friedman v. Tappan Development Corp.,* 22 N.J. 523, 126 A.2d 646 (1956).

In the instant case the contract provides no durational period, but rather expressly provides each party to the contract the authority to terminate the contractual relationship upon 90–day notice. Here, there is no assertion that the formalities of notice were not complied with. We hold that the express written contract term authorizing the termination upon 90–days notice is not overridden by an implied covenant of good faith and fair dealing which would supplant the express language of the contract and permit termination only upon good cause.

■ As noted above, Clement also argues that the contract is one for employment-at-will, his termination was contrary to public policy, and therefore his action also lies in tort. We disagree. In *Anderson, supra,* the Court of Appeals also had for consideration the termination of an insurance agent. The Court of Appeals well stated the law pertaining to the public policy exception to employment-at-will contracts, *i.e.*:

> For the sake of discussion we will assume—but we do not decide—that the limited protection afforded by law to employees at will also applies to independent contractors. The rule in Idaho, as in most states, is that unless an employee is hired pursuant to a contract which specifies the duration of the employment or limits the reasons for which the employee may be discharged, the employment is at the will of either party. The employer may terminate the relationship at any time for any reason without incurring liability. (citations omitted.) The only general exception to this rule is that an employer may be liable if the discharge is for a reason contravening public policy. The public policy exception has been held to protect employees who refuse to commit unlawful acts, who perform important public obligations, or who exercise certain legal rights or privileges. (citations omitted.)

*Anderson, supra,* 112 Idaho at 468–69, 732 P.2d at 706–07.

Here, there is no showing that the instant case falls within the strictures of *Anderson, supra. See also Jackson v. Minidoka Irrigation District,* 98 Idaho 330, 563 P.2d 54 (1977).

We hold that the district court was correct in concluding that Farmers' exercise of the right to terminate the contractual relationship pursuant to the express terms of the written contract did not constitute a breach of the contractual relationship, nor did the termination by Farmers constitute action violative of public policy. *See Jones v. EG & G Idaho, Inc.,* 111 Idaho 591, 726 P.2d 703 (1986); *Spero v. Lockwood,* 111 Idaho 74, 721 P.2d 174 (1986); *Staggie v. Idaho Falls Consolidated Hospital,* 110 Idaho 349, 715 P.2d 1019 (Ct.App.1986); *Jackson v. Minidoka Irrigation District, supra.*

■ Clement also asserts that factual issues remain as to whether or not the written contract provisions authorizing termination upon 90–days notice had been modified by oral agreements between the parties. As noted by the district court in its decision upon summary judgment, those assertions by Clement, even assuming their truthfulness, do not raise disputed issues of material fact. The alleged representations made by Farmers during negotiations leading to the written contract are all merged with and superceded by the written contract. The subjective beliefs of Clement that he could only be terminated for cause are directly contrary to the terms of the written contract and such subjective belief forms no basis upon which to find a subsequent oral modification of an earlier written contract. *See Minihan v. American Pharmaceutical Assn.,* 812 F.2d 726 (D.C.Cir.1987); *Page v. Carolina Coach Co.,* 667 F.2d 1156 (4th Cir.1982); *Peterson v. Wirum,* 625 P.2d 866 (Alaska 1981). *See also Galaxy Outdoor Advertising v. Idaho Transportation Department,* 109 Idaho 692, 710 P.2d 602 (1985).

We hold that the trial court did not err in granting summary judgment, and such order of the district court is affirmed. Costs to respondent.

BAKES and JOHNSON, JJ., concur.

JOHNSON, Justice, specially concurring.

I concur in the result reached in this case. I write to state the reason for my concurrence.

In my view, the agreement between Clement and Farmers is not an employment agreement. It is a contract establishing an agency relationship. Our Court of Appeals has stated that "an insurance agent whose function is solely to bring about contractual relations between his principals and others on his own initiative, without being subject to the principal's direction as to how he shall accomplish this result, is ordinarily held to be an independent contractor." *Anderson v. Farm Bureau Mutual Insurance Company of Idaho,* 112 Idaho 461, 465, 732 P.2d 699, 703 (Idaho App.1987). The agreement here specifically states that Clement is an independent contractor and not an employee. This difference is crucial to my decision. If Clement were an employee of Farmers, my vote might very well be different.

In *Anderson* the court of appeals said:
For the sake of discussion we will assume—but we do not decide—that the limited protection afforded by law to employees at will also applies to independent contractors.

112 Idaho at 468, 732 P.2d at 706.

I am not prepared to make the same assumption. The employee at will rule is limited to "employees" who have not been hired for a definite period of time. *Thomas v. Ballou–Latimer Drug Co.,* 92 Idaho 337, 341, 442 P.2d 747, 751 (1968); *Jackson v. Minidoka Irrigation District,* 98 Idaho 330, 333, 563 P.2d 54, 57 (1977); *MacNeil v. Minidoka Memorial Hospital,* 108 Idaho 588, 589, 701 P.2d 208, 209 (1985); *Watson v. Idaho Falls Hospitals,* 111 Idaho 44, 47, 720 P.2d 632, 635 (1986); *Spero v. Lockwood, Inc.,* 111 Idaho 74, 75, 721 P.2d 174, 175 (1986); *Jones v. EG & G Idaho, Inc.,* 111 Idaho 591, 593, 726 P.2d 703, 705 (1986). An employment relationship is a distinctly different relationship than a principal-independent contractor relationship. The benefits and obligations are substantially different. An employee has many benefits that an independent contractor does not. Among these are worker's compensation coverage, unemployment bene-

fits, and contributions by the employer to the social security fund. An employee is also subject to many obligations that an independent contractor is not. Among these is supervision and direction by the employer. Correlatively, under the doctrine of *respondeat superior* an employer is liable in tort for the tortious conduct of an employee committed within the scope of employment. *Scrivner v. Boise Payette Lumber Co.*, 46 Idaho 334, 268 P. 19 (1928); *Smith v. Thompson*, 103 Idaho 909, 911, 655 P.2d 116, 118 (Idaho App.1982). Ordinarily, a principal is not liable for the tortious conduct of an independent contractor. *Gates v. Pickett & Nelson Construction Co.*, 91 Idaho 836, 842, 432 P.2d 780, 786 (1967).

Clement and Farmers chose to contract with one another to create a principal-independent contractor relationship. The duties and responsibilities of that relationship are defined by the agreement between them. None of the legal principles that relate to an employer-employee relationship apply here. Clement was not an employee at will. He was not even an employee.

Because I have concluded that Clement was not an employee, I do not believe that the public policy exception to the employment at will rule needs to be considered here. Clement contracted to act as an agent of Farmers for a period that was stated in the agreement to end on his death or upon termination by either himself or Farmers on three months written notice. The agreement provided for payment to Clement upon the termination by Farmers to compensate Clement for any policy premiums that he had earned. What Clement seeks is damages representing future renewal premiums to which he might have become entitled if the agreement had not been terminated. These premiums are not something to which Clement was entitled under the agreement. They were mere expectancies. Unless we were to treat Clement as an employee of Farmers, we should not reach the question of why Farmers terminated the agreement and whether that reason would be a violation of public policy.

If we were to open the door to the public policy exception in this case, I believe that we would find it necessary to apply the same rule in all cases in which a contract was terminated by one of the parties pursuant to a provision in the contract. This would be a drastic change in the law of contracts. I am not prepared to make that leap.

Likewise, the contention by Clement that we should apply a good faith standard to the termination of the agreement by Farmers would constitute a novel development in our law. Whether good faith is required in terminating an employee at will must await determination in a case that poses the issue. This is not such a case.

HUNTLEY, Justice, dissenting.

I respectfully and forcefully dissent. The issue before the Court is whether a cause of action lies in Idaho for a wrongful and bad faith termination of an "at will" insurance agency contract.

The majority opinion holds that such wrongful, bad faith conduct is not actionable, which is a strange principle for a court of justice to embrace.

Since the majority opinion omits some of the most poignant facts which, if included, would make its result difficult to reach, I restate the facts and procedural history.

The Factual and Procedural Background

George Clement appeals the district court's granting of Farmers Insurance Exchange's (hereafter "Farmers") second Motion for Summary Judgment.[1] Clement

---

1. Farmers' Motion for Summary Judgment was denied by Judge Boyd R. Thomas and the case was set for trial. Subsequently, Judge Thomas retired and the case was reassigned to Judge Grant L. Young. Farmers renewed its Motion for Summary Judgment contending that Judge Thomas' decision did not address Clement's amended complaint, which was filed when the Motion for Summary Judgment was argued. Farmers further contended that Judge Thomas' decision was erroneous in light of more recent developments in employment Law. Judge Young granted Farmers' Second Motion for Summary Judgment and dismissed Clement's complaint.

had sought damages for breach of contract and wrongful termination of his "at will" insurance agency contract.

Clement entered into an Agent Appointment Agreement with Farmers in March 1977. This agreement provided in part that the amount of time spent in solicitation was at Clement's discretion:

Nothing contained herein is intended or shall be construed to create the relationship of employer and employee; rather, the Agent is an independent contractor for all purposes.

The time to be expended by the Agent is solely within his discretion, and the persons to be solicited and the area wherein solicitation shall be conducted is at the election of the Agent.

The Agent shall, as an independent contractor, exercise sole right to determine the time, place and manner in which he carries out the objectives of this Agreement, provided only that he conform to normal good business practice, and to all State and Federal laws governing the conduct of the Companies and their Agents.

The Agency Appointment Agreement also provided that the agency could be terminated "by either the Agent or the Companies on three (3) months written notice." It also provided that no "change, alteration or modification of this Agreement may be made unless it is in writing and signed by the Agent and an authorized representative of the Companies."

Clement became a profitable agent for Farmers, receiving awards for his productivity for the years 1981 through 1983. Farmer's District Manager, Everett Ostrum, also stated in his deposition that Clement was a profitable agent. In fact, Farmers' national publication named Clement in its April 1984 issue as a recipient of a "Preferred Underwriting Award" for the year 1983. With regard to the preferred underwriters, the publication states:

Certainly consistently high producers deserve all the recognition they get, yet in a quieter way, the consistently profitable producer is no less a hero or heroine. The Underwriting Contract Value Bonus is aimed at those agents who produce respectable volume, but with the accent on profit, the life-blood of any business.

In July, 1983, Ostrum met with Regional Manager, Don Raney, and Regional Sales Manager, Chuck Norman, with the goal of increasing productivity of Farmers agents. As a result of the meeting, it was decided that district managers would correspond with certain agents in order to foster an increase in profitable production and the number of insurance policies in force. Under the new productivity program, it was determined that any agent with less than seventy sales counts per month needed to be "worked with."

In August of 1983, Ostrum sent Clement a demand letter which, after congratulating him on his success with his new business endeavors, offered him the following choices:

(1) Immediately begin working full time as an insurance agent. In doing so increase your average monthly production to at least 90 count with a minimum of 20 life count by October 1, 1983. Reduce your Lapse Ratio and begin a growth trend in P.I.F. rather than a loss trend. If this is your choice I will insist on a written set of goals and plans stating how you plan to accomplish this.

(2) Agree to terminate your agency appointment agreement with FIG [Farmers Insurance Group].

I will give you until August 31, 1983 to advise me which option you choose....

Since Ostrum's ultimatum was in direct conflict with his agency contract, Clement hired attorney Paul Ripple to advise him. Ripple wrote to the President of Farmers on behalf of Clement, requesting that Farmers desist from breaching the agency contract and from threatening to terminate Clement. Farmers responded in September, stating in part that it did not "condone the implementation of any pressure, device or method to control the manner and means of the performance of any of our sales agents" and suggested cooperation on the part of all parties. In October, Farmers sent Clement a letter of termination, effective in three months.

Clement submitted the affidavit of Dave King, who was the Boise District Manager within the Pocatello region from 1980 to 1983, in support of his claim that Farmers encouraged bad faith terminations of agents:

As District Manager, I also had various conversations and meetings with Donald Rainey, the Regional Manager. During the summer of 1982, a division meeting was held at Twin Falls, Idaho. Craig Scheinost, the Division Agency Manager, was present as well as Everett Ostrum of the Idaho Falls District. At this division meeting in the summer of 1982, one segment of the meeting discussed methods by which agents could be terminated or forced to resign. District managers were instructed to document in the files any problems concerning agents. District managers were encouraged to document files on every agent producing under 70 sales counts, to check production, and if agents were not willing to resign, then district managers were encouraged to find other reasons for termination. It was stated by Scheinost "If you want to terminate an agent for whatever reason, then build a file." At this meeting, Everett Ostrum conducted a role play situation on how to gather facts, build a file and terminate an agent. He used as an example, a situation involving a woman he was actively trying to terminate.

. . . .

At various meetings with Craig Scheinost and other Farmers' representatives, it was implied that district managers would be well to force an insurance agent with a large agency to resign. The policies of that large agency could then be split between ten to fifteen agents so they could then become established in the insurance business. As a District Manager is paid based on the sales of the agents, this represents an attractive proposition to the district manager because with more agencies he can increase his income.

An insurance agent who sells insurance to a client receives 100% of the allocated commission. However, if an insurance agent is terminated, or resigns, his policies are then reassigned to other agents who receive only 40% of the annual commissions. Therefore, Farmers Insurance Company is able to retain the 60% of the commissions on continuing policies if an agency is terminated. Thus by terminating an agent with annual commission of $25,000, Farmers Insurance Group would save $15,000. However, the district manager would still receive the same commission.

. . . .

Agents were told they were their own boss, this was their business, they could devote what time they wanted to the business according to their own discretion. The only way their agency would be terminated was if the insurance company had actual cause to terminate them such as embezzlement, placing policies with other companies and other serious violations of the contract.

Clement asserts that even though the termination was in accordance with the terms of his employment at will contract, the termination was in bad faith and contravened public policy. In the alternative, Clement asserts that there are genuine issues of fact as to whether the provisions for termination were modified or waived to provide that he could only be terminated for cause.

## I.

### A. Public Policy and Bad Faith

Employment at will is terminable by either party at any time, without cause, unless the termination is in contravention of public policy. *Jackson v. Minidoka Irrigation Dist.*, 98 Idaho 330, 563 P.2d 54 (1977). We cited in *Jackson* the following definition of public policy:

The court continued, quoting from 72 C.J.S. Policy at page 212, to state, "public policy 'is the principles under which freedom of contract or private dealing is restricted by law for the good of the community. Another statement, some-

times referred to as a definition, is that whatever contravenes good morals or any established interests of society is against public policy.'"

*Jackson,* 98 Idaho at 333, 563 P.2d at 57, quoting *Petermann v. International Brotherhood of Teamsters,* 174 Cal.App.2d 184, 344 P.2d 25 (1959).

*Jackson* cites various case law examples of terminations at will that contravene public policy: *Petermann, supra,* (employee fired for refusing to give false testimony before the California Legislature); *Frampton v. Central Indiana Gas Co.,* 260 Ind. 249, 297 N.E.2d 425 (1973) (plaintiff fired for reporting an injury in order to collect worker's compensation); *Nees v. Hocks,* 272 Or. 210, 536 P.2d 512 (1975) (employee discharged for serving jury duty against her employer's wishes); and, *Monge v. Beebe Rubber Co.,* 114 N.H. 130, 316 A.2d 549 (1974) (married employee harassed and eventually fired for refusing to go out with her foreman).[2]

In *Jackson,* we cited with approval the following from *Monge:*

> We hold that a termination by the employer of a contract of employment at will which is motivated by *bad faith* or *malice* or based on *retaliation* is *not the best interest of the economic system or the public good* and constitutes a breach of the employment contract. (Emphasis added).

*Id.* at 334, 563 P.2d at 58. Using the *Jackson* definition of public policy, a bad faith termination certainly "contravenes good morals or any established interests of society." Further, employer bad faith or retaliation is not in "the best interest of the economic system or the public good." Employees and agents are not grist for business mills. As discussed below, the requirements of good faith and fair dealing are not new ideas either to contract or agency law.

A review of precedent on this issue establishes that a distinction frequently is made between the bad faith and public policy exceptions to termination of employment at will.[3] In fact, some courts have been criticized for "blurring the distinction" between the bad faith and public policy exceptions.[4] However, based upon the above analysis of *Jackson,* I find no merit in a hairsplitting distinction between bad faith and public policy exceptions in employment at will terminations generally.

Although authorities differ as to whether the employment (or master and servant relationship) has its English origins in contract or agency law,[5] both contract and agency law require good faith and fair dealing between the parties:

> *Every contract implies good faith and fair dealing between the parties....* Moreover, there is an implied undertaking in every contract on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out his part of the agreement, or *do anything which will have the effect of destroying or injuring the right of the other party to re-*

---

2. The New Hampshire Court later construed *Monge,* as applying "only to a situation where an employee is discharged because he performed an act that public policy would encourage, or refused to do that which public policy would condemn." *Howard v. Dorr Woolen, Co.,* 120 N.H. 295, 414 A.2d 1273, 1274 (1980). Our reliance on the analysis in *Monge* is in no fashion fettered by the New Hampshire Court's subsequent narrowing of its own rule.

3. A growing number of jurisdictions are beginning to recognize bad faith exceptions to employment contracts terminable at will. For a selection representative of this concept, *see: Magnan v. Anaconda Industries, Inc.,* 193 Conn. 558, 479 A.2d 781 (1984); *Siles v. Travenol Laboratories, Inc.,* 13 Mass.App.Ct. 354, 433 N.E.2d 103 (1982); *Cleary v. American Airlines, Inc.,* 111 Cal.App.3d 443, 168 Cal.Rptr. 722 (1980); *Savodnik v. Korvettes, Inc.,* 488 F.Supp. 822 (E.D. New York 1980); and *Fortune v. National Cash Register Co.,* 373 Mass. 96, 364 N.E.2d 1251 (1977).

4. Larson, Why We Should Not Abandon the Presumption That Employment is Terminable At Will, 23 Idaho L.Rev. 219, 243 (1986–87).

5. See, Note, Protecting at Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith, 93 Harv.L.Rev. 1816 (1979–80); see also Heinsz, The Assault on the Employment at Will Doctrine: Management Considerations, 48 Mo.L.Rev. 855 (1983).

*ceive the fruits of the contract.* (Emphasis added).

17 Am.Jur.2d *Contracts* § 256 (1964); see also *Luzar v. Western Sur. Co.*, 107 Idaho 693, 696, 692 P.2d 337, 340 (1984).

> *Throughout the entire relationship, a principal has the obligation toward his agent of exercising good faith in the incidents of their relationship,* and he is subject to the responsibility of using care to prevent the agent from coming to any harm in the prosecution of the agency enterprise. (Emphasis added).

3 Am.Jur.2d *Agency* § 246 (1964).

The Restatement (Second) of Agency (1957) also acknowledges the duties a principal owes to his agent:

> **§ 437.  Duty of Good Conduct**
>
> **Unless otherwise agreed, a principal who has contracted to employ an agent has a duty to conduct himself so as not to harm the agent's reputation nor to make it impossible for the agent, consistently with his reasonable self-respect or personal safety, to continue in the employment.**
>
> **§ 454.  Revocation in Bad Faith of Offer of Compensation**
>
> **An agent to whom the principal has made a revocable offer of compensation if he accomplishes a specified result is entitled to the promised amount if the principal, in order to avoid payment of it, revokes the offer and thereafter the result is accomplished as the result of the agent's prior efforts.**
>
> **Comment:**
>
> a.  If the agent has given his principal cause for terminating the contract of employment, the principal does not commit a breach of contract although he terminates it with a bad motive, or even though he gives an invalid excuse or misstates his reason. See § 409. It is different, however, where the agency is at the will of the principal, where there is no breach of contract on the part of the agent and no affirmative reason for the termination of the offer. If the principal is to pay compensation in proportion to the work done, there is no need for in-

voking the rule stated in this Section. If, however, the agreement is such that the principal can deprive the agent of all compensation by properly terminating the employment and if the agent is on the verge of success and, but for the aleatory element in the transaction, he would be entitled to practically full compensation for his services, the rule stated in this Section is necessary in order to prevent sharp dealing. *Under such circumstances, if the principal revokes his offer to the agent, intending thereby to take the benefits of the agent's services without paying for them, he acts in bad faith; and if he thus acts, specific reparation is afforded the agent ·by disregarding the revocation and determining his right to the promised compensation as though no revocation had been made.* (Emphasis added).

Ultimately, I am unconvinced there is any difference between employees at will and independent contractors when a bad faith termination is involved. Therefore, the limited protection afforded by law applies equally to both. *Anderson v. Farm Bur. Mut. Ins. Co. of Idaho,* 112 Idaho 461, 468, 732 P.2d 699, 706 (App.1987).

In the case before us, Farmers has not denied that the terms of its contract with Clement were breached by the demand that he work full time selling insurance. However, Farmers claims that the remedy for its breach is found in the Agency Agreement's "liquidated damages" clause. But if Farmers acted with an "intent to wrongfully deprive" Clement of the fruits of his contract when it terminated his agency, then it has breached the implied covenant of good faith. *Hall v. Farmers Ins. Exchange,* 713 P.2d 1027, 1030 (Okla.1985); Restatement (Second) of Agency § 454. Further, "[w]hether such an intent existed is an issue of fact to be decided by the jury." *Hall v. Farmers, supra.*

*Hall v. Farmers* is not only on point with this case on its facts, but it also involved the same defendant. The Oklahoma Court concisely states the public policy concern against bad faith terminations of contracts at will:

This Court has long recognized that parties should be free to contract for any lawful purpose upon such terms and conditions as they believe to be in their mutual interest. Such freedom is not absolute however, and the interests of the people of Oklahoma are not best served by a marketplace of cut-throat business dealings where the law of the jungle is thinly clad in contractual lace.

*Id.* at 1029.

The employer's interest in running his business as he sees fit must be balanced against the interest of the employee in maintaining his employment, and the public's interest in maintaining a proper balance between the two.

*Id.* at 1030, citing *Monge,* 316 A.2d at 551.

In conclusion we shall hold that it is contrary to the public policy of Idaho for an employer/principal to deprive an employee/agent of the fruits of his labor by wrongfully resorting to termination of a contract at will in order to profit thereby.

### B. Good Cause and Good Faith

My analysis in no manner equates good faith with good cause for termination. In other words, a requirement that good faith be exercised in an employment at will contract does not require that good cause for firing is necessary before and employee can be terminated. In fact, good cause to discharge would tend to negate the existence of bad faith in the decision to discharge an employee. Restatement (Second) of Agency § 454, Comment a (1957); *Gram v. Liberty Mut. Ins. Co.,* 384 Mass. 659, 429 N.E.2d 21, 26–27 (1981). "[T]ermination in the absence of good cause does not establish bad faith, and it is only a factor in determining whether there was fair dealing." *Gram,* 429 N.E.2d at 27.

Further, Clement would have the burden of proving at trial that Farmers' termination of the agency contract was in bad faith, which is a difficult burden.

### C. Public Policy Under Idaho Statutory Law

Frequently, public policy is expressed statutorily. My analysis is buttressed by the fact that there is pertinent statutory public policy in Idaho:

72–1302. **Declaration of state public policy.**—(a) As a guide to the interpretation and application of this act, the public policy of this state is declared to be as follows: *Economic insecurity due to unemployment is a serious menace to the health, morals and welfare of the people of this state. Involuntary unemployment is therefore a subject of national and state interest and concern* which requires appropriate action to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. The achievement of social security requires protection against this greatest hazard of our economic life. This can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The legislature, therefore, declares that, in its considered judgment, the public good, and the general welfare of the citizens of this state require the enactment of this measure, under the police powers of the state, and for the compulsory setting aside of unemployment reserves to be used for the benefits of persons unemployed through no fault of their own. (Emphasis added).

In *Custom Meat Packing Co. v. Martin,* 85 Idaho 374, 384, 379 P.2d 664, 670 (1963), this Court stated that the policy of the Employment Security Law "is to encourage the employer and employee to adjust their differences and thus avoid interrupting the employment."

Later, this Court stated:

[T]he legislature has sought to encourage stability of employment, I.C. § 72–1302(a), and one of the methods of which the legislature has adopted in accomplishing that purpose is to discourage voluntary termination of employment without "good cause" and voluntarily

casting oneself on the unemployment rolls. We cannot say that such constitutes an invalid state purpose.

*Pyeatt v. Idaho State University,* 98 Idaho 424, 426, 565 P.2d 1381, 1383 (1977).

### D. Public Policy and Retaliatory Firing for Hiring an Attorney

Clement alleges that he was terminated in part due to the fact that he hired an attorney to contest the termination threatened by Farmers. In ruling against Clement's claim—that termination for hiring an attorney was against public policy—the district court stated:

> All that an employee would have to do to prevent enforcement of a termination without cause clause in a contract would be to hire an attorney to contest the employee's discharge and then claim that he was discharged because he hired an attorney. See *Kavanagh v. KLM Royal Dutch Airlines,* 566 F.Supp. 242 (N.D.Ill. E.D.1983).

I disagree with the district court and would hold that a dismissal in retaliation against a party for seeking legal counsel to protect his interests in an employment contract is a clear violation of the public policy of this state. Our form of government is one that seeks to rule itself by civilized means. Civilized self-governing is ensured in part by free access to the judicial system by *all* citizens. Access to the courts guarantees an orderly and uniform resolution of civil disputes that protects us from potentially violent and chaotic breakdowns in our system. This right is so valuable that it is specifically addressed in Article 1, § 18 of the Constitution of the State of Idaho:

> **Justice to be freely and speedily administered.**—Courts of justice shall be open to every person, and a speedy remedy afforded for every injury of person, property or character, and right and justice shall be administered without sale, denial, delay, or prejudice.

It would be shameful to allow one party to force another to abide by changes in an employment at will contract—which changes result from the former's breach of the terms of said contract—by threatening retaliatory firing when the latter seeks to protect his legal interests upon the contract. Merely because a contract is at will does not mean that there are no rights inherent thereto. Further, discouraging a party from seeking legal counsel is but a brief step from denying that individual access to our courts. Although there is no violation of a constitutional right in this case, Article 1, § 18 of the Idaho Constitution offers a clear statement of the public policy regarding free access to our courts. I would not sanction the sort of bullying that results from disparity in bargaining power and forces an individual to sit on his legal rights for fear of retaliation by his employer that will undermine his very economic security.

Finally, my analysis would not create a situation in which an employee will hire an attorney merely to claim that he was "discharged because he hired an attorney." It is no easy task for a party to prove the intent of another in a dispute of this nature. Regardless, such is an issue to be resolved by the trier of fact and summary judgment was improper on the face of this record.

## II.

### Oral Modification of the Employment At Will Contract

Clement claims that provisions for termination were modified or waived to provide that he could only be discharged for cause. He alleges that Farmers, via Ostrum, represented to him that "this was the most protective contract in the insurance business" and that he "had to violate that contract in order to be terminated." Ostrum also indicated in his deposition that he represented to Clement that his agency contract would be for a long time.

The assurance that employment will be of long duration is insufficient to establish that an employment agreement is not terminable at will. *Allen v. Safeway Stores, Inc.,* 699 P.2d 277 (Wyo.1985); *Goodpaster v. Pfizer, Inc.,* 35 Wash.App. 199, 665 P.2d 414 (1983); *Parker v. United Airlines, Inc.,* 32 Wash.App. 722, 649 P.2d 181 (1982). In addition, Clement admitted

knowledge of the fact that Ostrum had no authority to enter into a contractual relationship on behalf of Farmers or to waive any of Farmers' contractual rights.

Furthermore, representations by Ostrum prior to the closing of·the contract would not waive contract rights not yet in existence and would be barred by the parol evidence rule. Any statements made prior to, or contemporaneous with, the written contract are barred by the parol evidence rule when such evidence serves only to contradict the written agreement. *Farnes v. Grover*, 106 Idaho 752, 682 P.2d 1299 (App.1984). Since the contract itself provided that no alteration or modification of the agreement could be made "unless it is in writing and signed by the Agency and an authorized representative of the Companies," oral modifications or waivers by Ostrum would be ineffectual.

Clement's claims as to oral modification or waiver are meritless, and I would affirm the summary judgment for Farmers on this issue.

The special concurring opinion of Justice Johnson correctly notes that we are not dealing with an employment agreement, but rather are dealing with an independent contractor agreement. No one has contended to the contrary and the careful reader will note that several of the authorities I have above analyzed make reference to both employees and/or agents.

I think it is a sad day for "justice" when this Court, having before it a case of first impression, adopts the following rule of law:

There is no cause of action in Idaho for an intentional, willful, bad faith termination of an agency relationship.

Most other wrongful, willful and bad faith violations of relationships between individuals or entities in the United States of America are actionable. The majority articulates no plausible reason for an exception when the tortfeasor happens to be the principle of an "at will" agency contract.

**BISTLINE, Justice, dissenting.**

## PART I

Without the benefit of having the record available, the reader will find the majority opinion logical, and, possibly compelling. The Court makes clear that the issue presented is a straight forward contractual arrangement, whereby either party could terminate their relationship upon 90 days notice. True, such a provision was built into the agency agreement. But it was a printed form agreement of the insurance company's making. The majority tells us that all is well because "[t]here may be a myriad of reasons on either side which make such a right of termination desirable or necessary." Maj. Op. at 300, 766 P.2d at 770. How many reasons make up a myriad I am not sure, but the reason Farmers terminated the relationship with Clement, unmentioned by the majority, is odious: Farmers wanted to deprive Clement of the commissions which would become his on renewals of insurance policies which he had sold.[1] This most likely is not one of the "myriad of reasons" envisioned by the majority as an acceptable basis for the company's termination of the agency. Regardless, the majority's approval of Farmers' bad faith termination of its agent is not acceptable.

We are, of course, but one vote shy of doing justice. The special concurrence is a vote to affirm the summary judgment on the basis that Clement was an agent—not an employee. This dichotomy is unconvincing.

The Restatement (Second) of Contracts, § 205 (1979) provides: "Duty of Good Faith and Fair Dealing. *Every* contract imposes upon each *party* a duty of good faith and fair dealing in its performance and its enforcement." (emphasis added). Whether an employee or an agent, Clement was a party to the contract. Furthermore, the Restatement (Second) of Agency § 454 (1957) provides:

---

1. This is the reason alleged in the complaint. Whether it is true, of course, would be a matter for the trier of fact, and certainly not an issue which can be decided in summary judgment proceedings.

**Revocation in Bad Faith of Offer of Compensation.** An agent to whom the principal has made a revocable offer of compensation if he accomplishes a specified result is entitled to the promised amount if the principal, *in order to avoid payment of it,* revokes the offer and thereafter the result is accomplished as the result of the agent's prior efforts.

(emphasis added). These provisions have been relied upon to ensure that salespersons receive their earned commissions. *See, e.g., Fortune v. National Cash Register Co.,* 373 Mass. 96, 364 N.E.2d 1251 (1977). Unaddressed by those in the majority is *Hall v. Farmers Ins. Exchange,* 713 P.2d 1027 (Okla.1985), which is remarkably similar to this case, the only difference being that Farmer's scheme mulcted a different salesperson. The court there held that where an insurance company intends to wrongfully deprive an agent of the fruits of his contract, it breaches its implied covenant of good fath. 713 P.2d at 1030–31. Unfortunately, for Mr. Clement, his claim for relief is being decided in Idaho.

Thus, it is seen that other courts have not used the employee versus agent distinction (one without a perceivable difference) as a roadblock to defeat claims based on the implied covenant of good faith. Justice Johnson, in his special concurrence, contends that if such a dichotomy is not upheld, a "novel," "drastic change in the law of contracts" will occur. This is much doubted. But, if true, the appropriate and unanswered question is, however, would such a change advance justice? *Stare decisis* does not demand blind allegiance to obvious error.

Anyone who becomes acquainted with the circumstances of this case will readily see that the no-cause termination, if upheld, allows the insurance company to inflict the *penalty* of forfeiture upon Clement. Regarding Justice Johnson's concerns above related, this same Court 34 years ago, wrought a drastic change in the law, for the better. *Graves v. Capic,* 75 Idaho 451, 272 P.2d 1020 (1954). Citing an earlier case, the Court ruled against the allowance of a forfeiture "unless the failure to do so would lead to an unconscionable result." 75 Idaho at 456, 272 P.2d at 1025. Recognizing that the instant case is unlike *Graves* in that the contract here results in Clement being penalized by forfeiting his entitlement to renewal premiums, not a question of stipulated damages as in *Graves,* the same principle applies. In *Graves* the Court said, "Here the damage stipulated for *by the parties* is clearly unconscionable and exorbitant." 75 Idaho at 459, 272 P.2d at 1028.

That same language is equally applicable to the circumstances here: the termination provision of the insurance companies form contract is clearly unconscionable and exorbitant. The company is guilty of bad faith in attempting to enforce it.

## PART II

In the first line of the majority opinion is the correct observation that the trial court rendered summary judgment against Clement. On page 300, 766 P.2d page 770 of the Maj. opinion, contrary to all of the case law holdings that all facts and inferences which can be drawn from those facts must be in favor of the party against whom summary judgment is being granted, the author of the majority opinion throws a way-outside roundhouse curve, "Presumably the right of termination being an express provision of the written contract, it was bargained for, and considered necessary by both parties."

In earlier times the coiner of that language entertained just the opposite view, *i.e.,* the Doctrine of Reasonable Expectations.

Corgatelli urges, and we agree, that the so-called "doctrine of reasonable expectations" (alias the doctrine of adhesion contracts) should be adopted in Idaho. [footnote omitted] That doctrine was articulated in the case of *Gray v. Zurich Insurance Company,* 65 Cal.2d 263, 54 Cal.Rptr. 104, 419 P.2d 168 (1966). *Gray* involved the duty of an insurer under a personal liability policy to defend the insured against personal injury or property damage lawsuits.

That court held that any exception to the basic underlying *obligation of the insurer* must be set forth in such a manner that the insured is clearly informed of its import. The court stated:

These principles of interpretation ... have found ... restatement in the doctrine of adhesion contract ... [A] contract entered into between two parties of unequal bargaining strength, expressed in the language of a standardized contract, written by the more powerful bargainer to meet its own needs, and offered to the weaker party on a "take it or leave it basis" carries some consequences that extend beyond orthodox implications. Obligations arising from such a contract inure not alone from the consensual transaction but from the relationship of the parties.

Although courts have long followed the basic precept that they would look to the words of the contract to find the meaning which the parties expected form them, they have also applied the doctrine of the adhesion contract to insurance policies, holding that in view of the disparate bargaining status of the parties we must ascertain that meaning of the contract which the insured would reasonably expect. 419 P.2d at 171–172 (footnotes omitted).

\* \* \* \* \* \*

**The doctrine of reasonable expectations is peculiarly applicable to contracts where as here it is drawn in such a fashion that one hand steals away what the other seemingly concerns. A close analysis of the literal meaning of the words in the provision in question solves none of the problems since the literal language is at odds with the reasonable expectations an insured would obtain from the contract.**

*Corgatelli v. Globe Life & Accident Insurance Co.,* 96 Idaho 616, 619, 533 P.2d 737, 740 (1975) (emphasis added).

While Justice Shepard today willingly engages in a *presumption* that the termi-

nation provision was bargained for, just the other day more was required:

It is the very essence of contract law that there must be a meeting of the minds of the parties for the contract to be binding upon the parties. *Pierson v. Sewell,* 97 Idaho 38, 539 P.2d 590 (1975); *Brothers v. Arave,* 67 Idaho 171, 174 P.2d 202 (1946). In the instant case, there was clearly no meeting of the minds ...

*Haener v. Ada County Highway Dist.,* 108 Idaho 170, 173, 697 P.2d 1184, 1187 (1985).

*Haener,* apparently, and *Corgatelli,* too, were naught but passing fancies.