870 P.2d 1324

**Manuel LEON, Plaintiff–Appellant,**

v.

**BOISE STATE UNIVERSITY; and Linda Anooshian, individually and in her official capacity as Chair of the Psychology Department at Boise State University, Defendants–Respondents.**

No. 20491.

Supreme Court of Idaho,
Boise, January 1994 Term.

March 21, 1994.

Skinner, Fawcett & Mauk, Boise, for appellant. Chris Kronberg, argued.

Hall, Farley, Oberrecht & Blanton, P.A.; and Lojek, Gabbert & Strother, Boise, attys. for respondents. Donald J. Farley and Donald W. Lojek, argued.

JOHNSON, Justice.

This is a public employment case, arising out of the decision of Boise State University (BSU) to issue a "terminal contract," rather than a "renewal contract," to a faculty member.

We conclude that the trial court correctly granted summary judgment dismissing the faculty member's claims for breach of contract, denial of due process of law, breach of the covenant of good faith and fair dealing, and intentional interference with contract.

## I.

### THE BACKGROUND AND PRIOR PROCEEDINGS.

In August 1985, Manuel Leon was hired by BSU as an assistant professor in the psychology department (the department) pursuant to a one year contract. BSU renewed Leon's employment each year, through the 1990–1991 school year, by means of a one-year contract.

The BSU faculty handbook (the handbook) provides that the department chair shall provide for an annual performance evaluation of all official faculty members of the department. The chair must send a copy of the final evaluation to the faculty member by April 1, covering the faculty member's performance during the previous calendar year.

The handbook also provides that faculty members become eligible to apply for tenure during the fifth year of service, and that all faculty members must apply for tenure no later than during the seventh year of service. The state board of education (the state board) policies require that no later than the seventh full year of a faculty member's employment, the faculty member must be evaluated for tenure. IDAPA 08.00.B.10,1.

The "tenure guidelines" that applied to the department in 1990 provided that faculty members were required to apply for tenure no later than during their sixth year of employment.

In the summer of 1990, Dr. Linda Anooshian, chair of the department, sent a memorandum to Leon suggesting that he submit tenure materials that fall for consideration by the department. Anooshian said in this memorandum:

In putting these materials together for you, I was surprised to find that, in the 1984 guidelines, application for tenure was not required until the seventh year (rather than the sixth year, as in current policy). Hence, although I would not recommend it, you could technically delay your application for tenure until your seventh year. Also, although the 1984 policy suggests other options, you should understand that a failure to achieve tenure would lead to a terminal contract for the following year.

In an affidavit submitted in this lawsuit, Leon states that following receipt of this memo, he met with Anooshian to discuss the timing of his tenure application and that he informed Anooshian that for "personal and professional" reasons he did not want to submit his tenure materials until the fall of 1991. Leon further states: "I believe Dr. Anooshian understood my intention regarding my application for tenure because she specifically agreed that I could wait until the Fall of 1991 to apply for tenure; she clearly understood and agreed that I would submit my tenure materials at that time."

In a deposition taken in this lawsuit, Anooshian states that Leon indicated to her after receiving the memo that he planned to submit materials for tenure consideration. According to Anooshian, it was several months later when Leon communicated to her that he wished to delay his tenure application until the fall of 1991. Anooshian states that she cautioned Leon against such a delay and that she informed Leon she anticipated problems with his tenure application.

In late October or early November 1990, Anooshian met with the departmental personnel committee (the committee) to discuss Leon's performance and to consider issuing him a terminal contract. The committee reached a tentative decision to recommend that BSU issue a terminal contract to Leon for the ensuing academic year. On November 28, 1990, Anooshian advised Leon about the committee's tentative conclusions regarding his 1991–1992 employment contract. She also invited Leon to submit to her by Janu-

ary 10, 1991, any additional materials that he would like the committee to consider.

In his affidavit, Leon states that during the fall of 1990 he was not told that his performance was being reviewed or that a terminal contract was being considered. Furthermore, Leon states that he was not provided an opportunity to participate in the review process. Leon also notes that he was unable to provide Anooshian with any supporting materials during the fall "due to the demands of fulfilling my professional duties and due to health problems stemming from severe allergies."

In early January 1991, Leon wrote to Richard L. Hart, dean of the BSU college of education, expressing his displeasure with Anooshian's "unscheduled review" and asking Hart to mediate his dispute with Anooshian. Hart advised Leon that he was "completely willing to receive and carefully consider any materials which [Leon] wish[ed] to supply which would assist [Hart] in making a decision [regarding a terminal contract]." Leon subsequently submitted materials to Hart for this purpose. In late February, however, Hart advised Leon by written memorandum that, after considering Leon's materials and Anooshian's recommendations, he had chosen to recommend to BSU's executive vice president, Larry Selland, that Leon's 1991–1992 contract be a terminal contract.

Leon wrote to Selland expressing his concerns with the review process and met with Selland on April 9, 1991. According to Leon, Selland informed him that it would be difficult to overturn the negative recommendations from Anooshian and Hart. Several weeks later, Selland telephoned Leon and told him that he had spoken with Anooshian and had decided not to reverse Anooshian's recommendation to issue Leon a terminal contract. Selland forwarded his recommendation regarding the terminal contract to the BSU president for official action.

Leon subsequently received a terminal contract for the 1991–1992 academic year, which he signed under protest and returned to BSU along with a "Notice of Claim for Breach of Contract and Tort Damages."

Several months before the expiration of his terminal contract, Leon sued BSU and Anooshian, alleging: (1) BSU and Anooshian breached his employment contract by issuing a terminal contract; (2) BSU and Anooshian violated his civil rights by denying him equal protection, procedural, and substantive due process; (3) BSU and Anooshian breached the covenant of good faith and fair dealing by issuing a terminal contract motivated by personal antagonism or callous disregard of the truth; and (4) Anooshian, individually, intentionally interfered with Leon's employment relationship with BSU by conducting a "special review" in derogation of BSU's established employment policies and procedures.

Acting on a motion for summary judgment filed by BSU and Anooshian, the trial court granted summary judgment dismissing Leon's claims. Leon appealed.

## II.

## THERE ARE NO GENUINE ISSUES OF MATERIAL FACT PRECLUDING SUMMARY JUDGMENT ON LEON'S BREACH OF CONTRACT CLAIM.

 Leon asserts that there are genuine issues of material fact concerning whether BSU and Anooshian breached his employment contract by conducting a "special review" which resulted in a decision to issue a terminal contract. We disagree.

Leon focuses his argument on the following policy of the state board that governs faculty evaluations at BSU:

Each year the chairman of a department must submit to the dean of the chairman's college an evaluation of each faculty member in the department. This evaluation, together with the opinion of higher administrators, will be used as one basis for the final recommendation relative to reappointment [or] nonreappointment ...

IDAPA 08.00.B.13,1.

In Leon's view, this policy prohibited Anooshian from reviewing Leon's perfor-

mance between annual reviews. This overlooks, however, the fact that the policies and procedures of the state board also require that a faculty member receive twelve months' notice of a contract non-renewal. IDAPA 08.00.B.12. Leon's interpretation would prevent BSU from making any employment decisions except in the context of an annual review. Additionally, the state board's policies and procedures also provide that the employment of a faculty member who has not attained tenure is subject to non-renewal with or without cause. *Id.* Pursuant to these state board policies and procedures, BSU had the authority to terminate Leon prior to his attaining tenure by giving him twelve months' notice.

■ Leon also contends that BSU breached a promise Anooshian made to him. He states in his affidavit that Anooshian "specifically agreed that [he] could wait until the Fall of 1991 to apply for tenure ..."

The fundamental problem with this claim is that the policies of the state board that apply to BSU provide: "Any commitment to employ a nontenured member of the faculty beyond the period of his or her current appointment is wholly ineffective without prior approval of the Board." IDAPA 08.00.B.10. There is no evidence that the state board approved employment of Leon beyond his annual contract. Therefore, even if Anooshian had promised Leon that he could defer his tenure application until the seventh year, this would have been an unauthorized act and wholly ineffective.

## III.

## THERE ARE NO GENUINE ISSUES OF MATERIAL FACT PRECLUDING SUMMARY JUDGMENT ON LEON'S CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

■ Leon asserts that there are genuine issues of material fact concerning whether BSU and Anooshian breached the covenant

of good faith and fair dealing by issuing a terminal contract "motivated by personal antagonism or callous disregard of the truth, as regards [Leon's] conduct." We disagree.

The covenant of good faith and fair dealing applied by the Court to employment contracts or relationships provides that "any action which violates, nullifies or significantly impairs any benefit or right which either party has in the employment contract, whether express or implied, is a violation of the covenant...." *Metcalf v. Intermountain Gas Co.*, 116 Idaho 622, 627, 778 P.2d 744, 749 (1989) (plurality opinion), reaffirmed in *Sorensen v. Comm Tek, Inc.*, 118 Idaho 664, 669, 799 P.2d 70, 75 (1990).

Leon's 1990–1991 contract was completed according to its terms, as was his 1991–1992 terminal contract. The opportunity to apply for tenure is not a benefit or right guaranteed to Leon by his one-year employment contracts. In *Clement v. Farmers Ins. Exchange*, 115 Idaho 298, 300, 766 P.2d 768, 770 (1988), the Court ruled that express contract terms are not overridden by the implied covenant of good faith and fair dealing.

## IV.

## THERE ARE NO GENUINE ISSUES OF MATERIAL FACT PRECLUDING SUMMARY JUDGMENT ON LEON'S CLAIM FOR TORTIOUS INTERFERENCE WITH HIS EMPLOYMENT CONTRACT.

■ Leon asserts that there is a factual issue whether Anooshian intentionally interfered with Leon's employment contract. We disagree.

Leon characterizes Anooshian's tortious interference as her "avoidance of established procedural mechanisms in recommending that [Leon] be issued a terminal contract."

In *Ostrander v. Farm Bureau Mut. Ins. Co.*, 123 Idaho 650, 851 P.2d 946 (1993), the Court noted that "a party cannot tortiously interfere with its own contract," and that "an

**370**

agent is only liable for actions which are outside its scope of duty to the [principal]." *Id.* at 654, 851 P.2d at 950.

In his complaint, Leon does not allege that Anooshian took any actions that were outside her capacity as department chair. In fact, Leon alleges that "at all times pertinent hereto ... [Anooshian was] acting within the scope of her employment as Chair of the Psychology Department...." Also, the facts asserted in conjunction with the motion for summary judgment indicate, without dispute, that Anooshian acted within the scope of her duties as department chair in reviewing Leon's performance in connection with the issuance of the terminal contract.

Leon argues that if Anooshian acted with malice, it does not matter if she also acted within the scope of her employment. Without accepting whether or not this is a limitation on the rule noted in *Ostrander,* we note that Leon did not allege in his complaint that Anooshian acted with malice toward him nor did he assert any facts in opposition to the motion for summary judgment that would create a genuine issue of material fact concerning malice.

## V.

### THERE IS NO GENUINE ISSUE OF MATERIAL FACT CONCERNING LEON'S LACK OF A PROPERTY INTEREST IN HIS EMPLOYMENT.

■ Leon asserts that there is a genuine issue of material fact concerning whether he had a property interest in his employment that entitled him to the protections of procedural and substantive due process of law pursuant to both the Fifth Amendment of the U.S. Constitution and Article I, § 13 of the Idaho State Constitution. We disagree.

Leon's right to due process before the termination of his employment depends upon whether he had a property interest in his employment. *Loebeck v. Idaho State Board of Education,* 96 Idaho 459, 461, 530 P.2d 1149, 1151 (1975).

The facts in Leon's case are very similar to those in *Loebeck.* Loebeck was a faculty member at Idaho State University (ISU) who was employed for five years by means of five, one-year contracts. In the sixth year, ISU offered Loebeck a terminal contract. Loebeck signed and returned the contract together with a letter from her attorney "advising that by signing the proffered contract she was not waiving or releasing any claim she might have in regard to tenure." *Id.* at 460, 530 P.2d at 1150. In affirming the trial court's decision rejecting Loebeck's claim that she had a property interest, the Court said:

> Nothing in the terms of the year to year contracts entered into between [Loebeck] and [ISU] or in any state statute or university rule or policy conferred on [Loebeck] any legitimate entitlement to tenure. She had nothing more than a hope of receiving tenure. "That hope is not a property right and the frustration of such a hope does not trigger the right to a hearing * * *" Although [Loebeck] had been rehired in consecutive years that did not change her nontenured status. She had only come closer to the time at which a decision had to be made as to granting or non-granting of tenure.

*Id.* at 461, 530 P.2d at 1151 (citations omitted).

The same analysis applies to Leon's claim that he had a property interest in his employment. The policies upon which Leon relies to establish his property interest indicate that a tenure award requires affirmative action by the state board and the BSU president. Until Leon acquired tenure, he did not have a property interest in his employment.

## VI.

### CONCLUSION.

We affirm the trial court's summary judgment.

We award costs, but not attorney fees, to BSU and Anooshian.

McDEVITT, C.J., and TROUT and SILAK, JJ., concur.

BISTLINE, Justice dissenting.

At about the same time this Court released its opinion in the case of *Metcalf v. Intermountain Gas Co.*, 116 Idaho 622, 778 P.2d 744 (1989), Dr. Manuel Leon was considering applying for tenure at Boise State University where he had been an assistant professor since 1985. In *Metcalf*, District Judge J. William Hart had entered a summary judgment in favor of the employer, Intermountain Gas Co., just as District Judge D. Duff McKee did in Dr. Leon's case several years later. The circumstances of the two cases are similar.

The Court in *Metcalf*, per Justice Bakes, reversed the district court, holding that triable issues of material fact did exist as to whether Intermountain Gas had breached its employment contract with Metcalf, and likewise held that Intermountain Gas had breached an implied covenant of good faith and fair dealing. Recognizing its retreat from the earlier holding in *MacNeil v. Minidoka Memorial Hospital*, 108 Idaho 588, 701 P.2d 208 (1985), the *Metcalf* Court noted, "[I]n the absence of an agreement between the employer and the employee limiting the employer's (or the employee's) right to terminate the contract at will, either party to the employment agreement may terminate the relationship at any time or for any reason without incurring liability." 116 Idaho at 624, 778 P.2d at 746 (*quoting MacNeil*, 108 Idaho 588, 701 P.2d 208 (1985)). Citing *Harkness v. City of Burley*, 110 Idaho 353, 356, 715, P.2d 1283, 1286 (1986), the Court added:

> However, such a limitation on the right of the employer (or the employee) to terminate the employment relationship 'can be express or implied.' ... A limitation may be implied if, from all the circumstances surrounding the employment relationship, a reasonable person could conclude that both parties intended that the employer's (or the employee's) right to terminate the employment relationship-at-will had been limited by the implied-in-fact agreement of

the parties. *See, e.g., Spero v. Lockwood, Inc.*, 111 Idaho 74, 721 P.2d 174 (1986); *Wagenseller v. Scottsdale Mem. Hospital*, 147 Ariz. 370, 710 P.2d 1025, 1036 (1985) (*en banc*) ('An implied-in-fact contract term ... is one that is inferred from the statements or conduct of the parties.'); 1 A. Corbin, § 17, at 38 (1960).

116 Idaho at 624, 778 P.2d at 746.

The *Metcalf* Court, Justice Bakes authoring, with Justice Johnson concurring, and Justice Huntley concurring in the result and writing, with which Justice Bistline concurred,[1] recognized that:

> '[A]n employee's handbook can constitute an element of the contract.' *Harkness v. City of Burley*, 110 Idaho 353, 356, 715 P.2d 1283, 1286 (1986); *Johnson v. Allied Stores Corp.*, 106 Idaho 363, 679 P.2d 640 (1984). Unless an employee handbook specifically negates any intention on the part of the employer to have it become a part of the employment contract, a court may conclude from the review of the employee handbook that a question of fact is created regarding whether the handbook was intended by the parties to impliedly express a term of the employment agreement. *Spero v. Lockwood, supra; Harkness v. City of Burley, supra; Johnson v. Allied Stores Corp., supra; Wagenseller v. Scottsdale Mem. Hospital, supra.*

> In the present case [*Metcalf*] the employee handbook was silent on the question of whether the terms and employee benefits set out in the handbook affected or otherwise modified the employer's right to terminate the employment relationship at will. Accordingly, we conclude, after considering all the circumstances of this case, that a material issue of fact exists regarding whether, by providing for accumulated sick leave benefits, the employer impliedly agreed with the employee that the employment relationship would not be terminated or the employee penalized for using the sick leave benefits which the employee had accrued. '*The trier of fact must determine*

1. Justice Shepard sat, but did not participate due to his untimely death.

**372**

whether *"a contract existed* between the parties by virtue of the ... policy manual." ' *Harkness v. City of Burley,* 110 Idaho at 356, 715 P.2d at 1286.

116 Idaho at 625, 778 P.2d at 747 (emphasis added). The partial summary judgment in *Metcalf* was reversed by this Court and the cause was remanded for trial.

The instant controversy, *Leon v. Boise State University,* culminated in the above-mentioned entry of a summary judgment in favor of defendant, Boise State University, and against the plaintiff, Dr. Manuel Leon. The district court's decision dismissed Dr. Leon's various claims, i.e., breach of contract, denial of due process of law, breach of the covenant of good faith and fair dealing, and intentional interference with contract. This Court's majority opinion sets forth the background and prior proceedings relating to the litigation, and which are germane hereto and need not be repeated.

However, a careful reading of the reporter's transcript of the trial court proceedings discloses that Dr. Leon was unjustly dealt with, first by Dr. Anooshian and BSU, and then by the district court in entering a summary judgment against Dr. Leon and by not allowing certain triable issues of material fact to be put before a jury for determination. Dr. Leon argues that an annual evaluation was not performed prior to Anooshian making a negative recommendation on his becoming tenured. Even if we cannot say with certainty that this occurred, Anooshian appears to have led Dr. Leon to believe that he would be considered for tenure and then proceeded to recommend that he not be tenured. The jury was entitled to hear the evidence Dr. Leon intended to present as to why he was treated unfairly. For these reasons, I respectfully dissent from the majority's opinion in this case.